No. 2014-1299

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

IN RE: ORBITAL TECHNOLOGIES CORP.,

Appellant.

---

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,
PTAB APPEAL 2013-004264 IN EX PARTE REEXAMINATION
No. 90/011,865 OF U.S. PATENT 7,473,008

---

**BRIEF OF APPELLANT ORBITAL TECHNOLOGIES CORP.**

---

Heather D. Redmond
Nathaniel P. Longley
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

April 21, 2014

*Attorneys for Appellant Orbital
Technologies Corp.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Orbital Technologies Corp. certifies the following:

1.      The full name of every party or amicus represented by me is:

Orbital Technologies Corp.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Orbital Technologies Corp.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Heather D. Redmond
Nathaniel P. Longley
Ronald Brown
Min (Amy) S. Xu

Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

Respectfully submitted,

DORSEY & WHITNEY LLP

Dated:  April 21, 2014

By  /s/ Heather D. Redmond
     Heather D. Redmond
     Nathaniel P. Longley
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

***Attorneys for Appellant***
***Orbital Technologies Corp.***

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES .................................................1

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES .................................................................2

STATEMENT OF THE CASE ............................................................4

    A.    The '008 Patent .................................................................4

    B.    The Prior Art ....................................................................7

        1.    Tomofuji.................................................................7

        2.    Kuiper....................................................................8

        3.    Lebens ...................................................................9

        4.    Ignatius................................................................10

        5.    Janssen................................................................13

        6.    Tazawa ................................................................14

        7.    Masuda................................................................16

    C.    Anonymous Request for *Ex Parte* Reexamination ...........17

    D.    Prosecution of the Reexamination .....................................18

    E.    Orbital's PTAB Appeal And The Examiner's Machine
        Translation of Tomofuji .....................................................20

SUMMARY OF THE ARGUMENT ...................................................23

ARGUMENT ...................................................................................26

I.       STANDARD OF REVIEW .......................................................26

II.   THE EXAMINER'S FAILURE TO PROVIDE A COMPETENT
      TRANSLATION OF TOMOFUJI DURING REEXAMINATION
      JUSTIFIES REVERSAL OF THE BOARD'S DECISION ........................27

      A.   The Office Erred When It Proceeded With Reexamination
           Despite The Requestor's Failure To Satisfy The Minimum
           Request Requirements ..........................................................................28

      B.   The Office Erred When It Relied Upon A Translation Of
           Tomofuji, Without Providing A Copy Of The Translation Or
           Notice Of The Reliance To Orbital ....................................................31

      C.   The Machine Translation of Tomofuji Cannot Support The
           Examiner's Finding Of Obviousness ..................................................32

      D.   Orbital Did Not Waive Its Objections To The Translation Issues ......35

III.  THERE IS NO PRIMA FACIE CASE OF OBVIOUSNESS, AND
      THE BOARD SHOULD BE REVERSED ...................................................37

      A.   All Of The Proposed Rejections Of Orbital's Claims Rely On
           The Same Structure And Do Not Reproduce The Claimed LED
           Light Mounting Configuration ...........................................................38

      B.   The Difference Between The Claimed Invention And The Prior
           Art Is Substantial ................................................................................40

      C.   Where The References Lead Away From The Proposed
           Reconstruction Of The Invention As Claimed, There Is No
           Burden On Orbital To Show That The Prior Art Would Never
           Use The Claimed Cooling System .....................................................42

CONCLUSION .......................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Baxter*,
  678 F.3d at 1361 ............................................................................27

*In re Donaldson Co.*,
  16 F.3d 1189 (Fed. Cir. 1994) (en banc) .........................................26

*In re Giannelli*,
  739 F.3d 1375 (Fed. Cir. 2014) ..................................................43, 44

*Ex Parte Giannelli*,
  No. 2013-1167 at 9 .........................................................................45

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)........................................................................27, 34

*In re Kathawala*,
  9 F.3d 942 (Fed. Cir. 1993) ............................................................26

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 538 (2007)........................................................................37

*In re Lovin*,
  652 F.3d 1349 (Fed. Cir. 2011) ......................................................27

*Rapoport v. Dement*,
  254 F.3d 1053 (Fed. Cir. 2001) ......................................................27

*In re Rijckaert*,
  9 F.3d 1531 (Fed. Cir. 1993) ..........................................................38

*In re Rinehart*,
  531 F.2d 1048 (CCPA 1976) ..........................................................38

*Ex Parte Rudd*,
  No. 2007-3775 (PTAB June 25, 2008).......................................25, 33

*Ex Parte Rudd*,
  No. 2008-6250 at 4-5 (PTAB July 15, 2009) ...................................34

## Statutes

28 U.S.C. § 1295(a)(4)(A) ...................................................................1

35 U.S.C. § 103 .......................................................................27, 34, 37, 44

35 U.S.C. § 302 .....................................................................................28

35 U.S.C. § 303(a) ............................................................................23, 32

Pub. L. No. 112-29, § 3(c), 125 Stat. 284, 293 (2011) ............................................27

## Other Authorities

37 C.F.R. § 1.104(c)(2) ............................................................................25

37 C.F.R. § 1.510 ....................................................................17, 24, 28, 29

37 C.F.R. § 104(c)(2) ..............................................................................31

MPEP § 706.02(II) ...........................................................................21, 25, 31, 32

MPEP § 2142 ......................................................................................38

MPEP § 2143 ...................................................................................25, 31

MPEP § 2227 ..................................................................................24, 29

*SNQ Clarification,* Fed. Reg. Vol. 75, No. 122 (June 25, 2010).....................35, 36

## STATEMENT OF RELATED CASES

No other appeal from the United States Patent and Trademark Office Patent Trial and Appeal Board ("PTAB" or "Board") has previously been made in *ex parte* Reexamination No. 90/011,865 of U.S. Patent 7,473,008, before this Court or any other appellate court.

The Court's decision in this appeal may directly affect or be directly affected by the Court's decision in copending Appeal No. 2014-1298, *In re: Orbital Technologies Corp.*, on Appeal from *Ex parte Orbital Technologies Corporation*, No. 2013-4262 (PTAB October 30, 2013), Reexamination No. 90/011,864 of related U.S. Patent 7,220,018.

The claims of U.S. Patent 7,473,008 were previously the subject of *ex parte* Reexamination No. 90/009,662, filed March 29, 2010, and are thus subject to Ex Parte Reexamination Certificate (8516th), issued September 6, 2011.

The claims of related U.S. Patent 7,220,018 were the subject of a Markman hearing in *Orbital Technologies Corp. v. PFO Lighting, Inc.*, 2008 Markman 4735164, 2008 WL 4735164 (unpublished).  A0771-78.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1295(a)(4)(A), providing exclusive jurisdiction on appeal from a decision of the PTAB in a reexamination proceeding.  Appellant Orbital Technologies Corporation

("Orbital") filed a timely Notice of Appeal on December 30, 2013, following the final Board Decision in *Ex parte Orbital Technologies Corporation*, No. 2013-4264 (PTAB October 30, 2013), following Reexamination No. 90/011,865 of U.S. Patent 7,473,008. A1299-1303.

## STATEMENT OF ISSUES

1.     Whether the Board erred when it found that the Examiner was allowed to proceed with the *ex parte* reexamination, when the anonymous third party Requestor failed to comply with statutory and regulatory reexamination requirements, and where the Office is required to vacate the filing date under such circumstances?

2.     Whether the Board erred when it found that the Examiner was not required to provide Orbital with the English translation of the primary prior art reference the Examiner relied upon to invalidate Orbital's patent, and that Orbital was not entitled to notice of the Examiner's reliance on a translation, when the Information Disclosure Statement indicated that no translation was considered?

3.     Whether the Examiner and Board erred when they found that the machine translation of the Tomofuji patent provided competent evidence of the content of the Japanese language patent, where the translation is in many places incomprehensible and contains untranslatable words, and where the face of the

document contains multiple disclaimers as to the accuracy and reliability of the translation?

4.      Whether the Board erred when it found that Orbital waived any objection regarding the Examiner's failure to provide the English translation of the primary prior art reference relied on by the Examiner to invalidate Orbital's patent, where Orbital was not fully apprised of the issue until after the close of prosecution?

5.      Whether the Board's factual findings are supported by substantial evidence, and whether the Board erred in finding a prima facie case of obviousness, where the combination of prior art references would not teach the claimed configuration of elements, and where there was no suggestion or motivation to combine the references?

## STATEMENT OF THE CASE

An *ex parte* reexamination of U.S. Patent 7,473,008 ("'008 patent") (as originally issued and as amended in a prior reexamination proceeding) was ordered September 27, 2011, based on an anonymous third-party Request.  A0130; A0351.  Orbital appealed to the Board from the Examiner's Final Rejection (PTAB Appeal 2013-004264).  A0684.  The Board affirmed the Final Rejection, and denied Orbital's subsequent Request for Rehearing.  A0002-16[1]; A0018-57.  Orbital timely appealed.  A1223.

### A.    The '008 Patent

The '008 patent, MARINE LED LIGHTING SYSTEM AND METHOD, was filed March 22, 2007.  The '008 patent issued January 6, 2009, with 18 claims.  A1288-98.  A Reexamination Certificate (8516th) issued for the '008 patent on September 6, 2011.  Claims 1, 2 and 15 were amended in the Reexamination Certificate; claims 8-14 were cancelled; and claims 307 and 16-18 remained as issued in the original '008 patent.  A1299-1303.  Claims 1 and 15 are independent.  A1301-03.

The '008 patent is generally directed to an LED (light emitting diode) lighting system for an open-top marine habitat.  Claim 1 describes an LED light engine comprising a plurality of individual LEDs, mounted to the inner side of a

---

[1] Page numbering in the attached Addendum is consistent with the Joint Appendix.

housing, opposite the outer side, so that the LEDs face the open top of the marine habitat when the housing is connected to the top edge.  A1301.  The claim also requires a cooling means for dissipating heat.  *Id.*  Specifically, '008 patent claim 1 requires:

> 1.  A combination marine habitat and lighting system, comprising:
>
> a marine habitat having an open top defined by a top edge; and
>
> a lighting system comprising:
>
> > a housing connectable to the top edge to substantially cover the open top, the housing including an inner side facing the open top when the housing is disposed over the top edge, and an opposite outer side; and
> >
> > an LED light source mounted to the inner side of the housing, the LED light source comprising at least one light engine having a plurality of individual LEDs capable of providing light at a wavelength from about 380 nm to about 690 nm; and
> >
> > cooling means for dissipating heat generated by the LED light source.

*Id.*  Independent claim 15 is directed to a method:

> 15.  A method of lighting a marine habitat for marine growth, comprising:
>
> providing an LED light source disposed on an inner side of a housing;
>
> positioning the housing over an open top of the marine habitat;
>
> providing a power supply for driving the LED light source;
>
> controlling illumination of the LED light source at a level sufficient to support the marine growth; and

providing cooling means for dissipating heat generated by the LED
light source.

A1302.

To promote growth, marine life forms such as coral and algae require light
of specific intensity, over a particular wavelength range. A1294. The arrangement
and method claimed in the '008 patent – with the combination of LED lighting
system, intensity controller, and cooling system – provides optimal wavelengths
necessary to support photosynthesis and biological development of specific marine
plant and animal life. A1294.

The technology described in the '008 patent was a substantial advance over
prior systems. The claimed LED light engine provides greater intensity and less
radiant heat output than a traditional fluorescent lighting system, with lower
operating voltage for improved safety and less heat dissipation. A1294-95. In
addition, LEDs do not experience degradation of wavelength with age, as in
fluorescent lighting. *Id.* The '008 patent inventors realized that preventing
wavelength degradation may also require a cooling system; however, the cooling
systems designed for traditional fluorescent lighting arrangements were not
suitable for LEDs, because very little heat is actually generated by the LED bulbs
themselves. Instead, heat must be drawn off the LED driver electronics, including
current drivers, light engine selection switches, and other electronic components.
*Id.* Fluorescent mounts designed to draw air over the bulbs may have little or no

effect on an LED light engine, because they do not address the driver electronics. The mounting and cooling configuration and method claimed in the '008 patent is thus critical. A0630.

### B.    The Prior Art

#### 1.    Tomofuji[2]

Japanese patent publication No. 09-308409 ("Tomofuji") is generally directed to a device for cooling fluorescent lights in an aquarium fish basin. A1073. In general, Tomofuji describes a fish basin [1] with an illuminator cover [3] mounted on the top, the lower portion of the cover containing one or more fluorescent bulbs [4] mounted to a reflector [7]. The lights are separated from the inner side of the cover [3] by an air space [6]. The illuminator cover contains an air releasing portion [11] comprising vents [12]. The reverse side of the air releasing portion [11] is equipped with a fan motor, designed to generate airflow over the fluorescent bulbs – the source of the heat. A1081.

---

[2] The discussion of Tomofuji is based, to the extent possible, on the machine translation provided by the Examiner with the Office's Answer. Orbital provides this discussion without waiving its objections based on the translation issues raised in this appeal and below.



A1077-78.  Nothing in the Tomofuji cooling system shows how to dissipate heat

generated by the LED driver electronics, including current drivers, light engine

selection switches, or other electronic components, which were not present in

Tomofuji's traditional fluorescent lighting system.  A1295; A1297.

## 2.  Kuiper

PCT International Publication No. WO 91/18970 ("Kuiper") is directed to

cultivating a phototrophic aquatic organism in an aqueous environment, using

artificial light of selected wavelengths from monochromatic light sources.  A0218.

There are no figures in the Kuiper reference.  Based on the description, the

phototrophic aquatic organisms, in particular, relatively fast-growing unicellular

organisms, can be used to remove organic contaminations and inorganic compounds from city sewage or industrial waste water. They can also be used for chemical production, to produce substances found in food, fertilizers, medical preparations and cosmetics. A0218-19.

Kuiper teaches that lamps and other sources of artificial light involve high energy costs, and that sunlight also has relevant limitations. Thus, Kuiper teaches the use of monochromatic light sources, such as LEDs or lasers, where the choice of the wavelength depends on the organism to be cultivated. A0219. Kuiper does not teach the need for cooling, nor does it provide any detail regarding the structure or type of tank that could be used to cultivate the marine life.

### 3. Lebens

United States Patent No. 6,305,818 ("Lebens") has no relationship to the heating of aquatic environments or the promotion of plant or animal growth. Instead, Lebens is directed to a handheld flashlight or strobe. The flashlight includes a plurality of pulsed LEDs and an electrical circuit that selectively applies power to the LED units, in order to maintain a predetermined light output as the charge or voltage varies, or to control the light output or color spectrum. A0238.



*Figure 1*

A0239.  In one embodiment, for example, a flashlight is used in conjunction with a portable video camcorder or video camera, with a synchronization signal to synchronize the light pulses from LEDs to the video camera frame rate.  In other embodiments, a feedback circuit increases pulse width, frequency, or height as the battery voltage or power declines, or a feedback circuit measures the current through LEDs and makes appropriate adjustments to the pulse width or frequency in order to maintain a desired light output.  A0253.

### 4.    Ignatius

United States Patent No. 5,278,432 ("Ignatius") is directed to a monolithic array of optoelectronic devices such as LEDs or cold cathode fluorescent devices, with a metal heat sink substrate and a ceramic layer.  The LEDs are housed in a modular housing with a power regulating circuit and override features to produce maximum LED output for brief periods of time, particularly to enhance and test plant growth or irradiate samples of living cells.  A0268; A0274-75.



*Figure 1*

A0269. Figure 1 depicts array [10] of LEDs [14] or other optoelectronic devices, with aluminum or copper-coated substrate [12] to act as a heat sink. A layer [16] of substantially non-conductive material is formed on the substrate [12], preferably a ceramic. LEDs are grouped into a plurality of series-connected sets [18] and [20], each preferably occupying a one inch by two inch area, so that adjacent sets occupy a two inch by two inch area. A0275.



*Figure 4 of Ignatius*



*Figure 5 of Ignatius*

A0271-72. Figures 4 and 5 of Ignatius depict LED array [10] in a modular unit

[26] particularly suitable for enhancing plant growth. Modular units may be

connected in parallel to provide a large scale artificial lighting environment. The modular unit includes a housing [28] to support the LED array, with air vents [30] and a power cord connector [32]. A glass cover plate [34] protects the LED array from the environment. The internal heat sink [36] has fins or vanes [38] to dissipate heat, with an internal fan [40] to pull the heat from the interior of the housing and propel it into the environment. A circuit board [42] contains components of an internal DC power supply, current regulator and override circuit. A0275; *see also* A0274 ("The array is preferably covered with a glass cover to protect it from the environment.").

### 5. <u>Janssen</u>

The article "Photosynthetic efficiency of Dunaliella tertiolecta under short light/dark cycles," Enzyme & Microbial Tech. 29 (2001) 298-305 ("Janssen") is directed to the photosynthetic efficiency of algae exposed to light/dark fluctuations inside a photobioreactor. A0260. In the Janssen reactor setup, Dunaliella tertiolecta was cultivated in a flat bioreactor with a 1000 ml liquid volume, placed in an aquarium filled with water maintained at a cultivation temperature of 30° C. The front side of the reactor was illuminated with a 20x30 cm panel of LEDs, placed outside the aquarium. A0262.

###### 6. <u>Tazawa</u>

Japanese patent publication no. 10-162609 ("Tazawa") is directed to a lighting apparatus for a water tank, "which increases the decorative effect of the water tank, promotes growth of coral and water plants inside the water tank, and generates little heat." A0231.[3]



*Figure 1 of Tazawa*

A0233. Figure 1 shows a water tank, for example at the entrance of a store or hotel lobby. A filter apparatus [2] is arranged at the top of the water tank, with an air pump [3]. A lighting apparatus [4] is also arranged on top of the tank, with a controller [7], switch [8], and dimmer [9]. In addition to molded objects [10], living things such as water plants and coral can be arranged inside the tank as

---

[3] Citations to Tazawa are to the English translation.

decoration. A0232. The lighting apparatus includes a substrate [5] to support the LED lamps [6] arranged in rows as shown in Figure 2 below, for example, with red, green, and blue LEDs arranged alternatively in rows. *Id.*



*Figure 2 of Tazawa*

A0233. When blue LED lamps are lit, an ocean light environment can be reproduced. Changing the proportion of green, blue and red LED lamps in accordance with the colors of the fish, molded objects, and living things inside the tank can increase dramatic effect. Alternatively, a proportion of lamps can be lit that obtain a light quality balance near the photosynthesis curve. A0232-33. There is no mention of any cooling mechanism, or the need for any cooling mechanism, in the Tazawa disclosures.

## 7.    <u>Masuda</u>

Japanese patent publication no. JP 06-319410 ("Masuda") is directed to a lighting unit arranged on a water tank, used for ecological research on fish in space.  Light-emitting diodes [3] (see Figs. 1-2 below) are arranged in a plurality of holes in a transparent plate [7].  Low-luminance light of low heat generation is emitted by the diodes to create a dimly lit environment inside the tank, without change in temperature, which calms live fish to such a degree that they can sleep quietly, and ecological experiments can be conducted in space.  A0280.[4]



*Figure 1*

*Figures 2(a) (left) and 2(b) (right)*

---

[4] Citations to Masuda are to the English translation.

A0283.  Figure 1 shows an example with a water tank.  Figures 2(a) and 2(b) show lighting unit [2] with a transparent plate [7] having a plurality of holes with light emitting diodes [3].  Resistors [4] are provided on the back face of transparent plate [7], connected in series to the diodes.  Sealing filler [8] is provided on the back of the diodes and resistors, and wire coating filler [9] seals the entire back face of the transparent plate.  The diodes are connected in series to the resistors and power supply [6].  Wires [5] penetrate the wire coating filler, and the edge of the transparent plate is sealed with materials [10] and [11] to the water tank [1]. A0282.

### C.     Anonymous Request for *Ex Parte* Reexamination

The Request for *ex parte* reexamination of the '008 patent was filed by an anonymous third party under 37 C.F.R. § 1.510(a).  A0130.  The Request alleged nine different substantial new questions of patentability, and nine different grounds for rejection, each based on Tomofuji, in various combinations with Kuiper, Ignatius, Lebens, Tazawa, Janssen, and Masuda.  A0156-160.

In the Request Transmittal Form, the Requestor represented that "[a]n English language translation of all necessary and pertinent non-English language patents and/or printed publications is included."  A0130.  The Information Disclosure Statement indicates that a translation of the Japanese language patents Tazawa and Masuda were included with the Request; however, only an English

language abstract was provided for Tomofuji. A0191-93. Consistent with the IDS, the Requestor relied only on the English abstract and drawings in its proposed rejections and accompanying claim charts. *E.g.*, A0293; A0295; A0299-301.

### D. Prosecution of the Reexamination

The Order granting the Request for *ex parte* reexamination states that the substantial new question of patentability (SNQ) finding was based on the six patent publications provided with the Request: Tomofuji, Tazawa, Kuiper, Lebens, Ignatius, and Masuda. A0352. The IDS does not indicate consideration of an English translation of Tomofuji (only an English abstract), and no translation of the text was provided.

| FOREIGN PATENT DOCUMENTS | | | | | | |
|---|---|---|---|---|---|---|
| Examiner Initials* | Cite No.¹ | Foreign Patent Document<br><br>Country Code³⁻ ⁴Number ⁴ ⁴Kind Code⁵ (if known) | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T⁶ |
| /KJW/ | | JP 9308409 | 12-02-1997 | Tomofuji | | |
| /KJW/ | | WO 91/18970 | 12-12-1991 | Kuiper | | |
| /KJW/ | | JP H10-162609 | 06-19-1998 | Tazawa | - | ✓ |
| /KJW/ | | JP H6-319410 | 11-22-1994 | Masuda | | ✓ |
| | | | | | | |
| | | | | | | |

| Examiner Signature | /Kenneth Whittington/ | Date Considered | 09/20/2011 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. ¹Applicant's unique citation designation number (optional). ²See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. ³Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). ⁴For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. ⁵Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. ⁶Applicant is to place a check mark here if English language Translation is attached.

A0363-64. With regard to Tomofuji, the Order cites only Tomofuji's drawings in support of the SNQ findings – the examiner relied upon none of the Japanese text. A0357-359.

In the first Office Action, the Examiner carried on all of the third-party Requestor's proposed rejections, citing the Japanese patent publication by Tomofuji as the primary reference, in various combinations with the other references. A0371-89. In general, the Examiner found that Tomofuji disclosed every element of claims 1 and 15, except that it did not teach the use of LEDs in lieu of fluorescent lamps. *E.g.,* A0371-73. The Examiner found that Kuiper taught the use of LEDs in a marine habitat; that Ignatius taught the cooling of LED arrangements; that Lebens taught a power supply sufficient to operate and drive LEDs and a controller connected with the supply; and that Tazawa taught the use of LEDs as individual lights. A0374-78; A0381. With regard to claim 3, the Examiner found that Masuda taught a waterproof light plate or housing, where the LED light sources are mounted within the housing. A0379. With regard to claim 7, the Examiner found that Janssen taught the particular light intensity capabilities of LEDs, and that it would have been obvious to provide LEDs capable of operating in the recited intensities to promote better aquatic life. *E.g.*, A0379-80.

Again, with respect to Tomofuji, the Examiner did not cite or reference any English translation of the underlying Tomofuji document, or otherwise indicate that a translation had been obtained or relied upon, and no translation of the underlying Japanese text was provided. The Examiner did – for the first time –

cite portions of the text of Tomofuji, as opposed to the English abstract and drawings. *E.g.*, A0372-73.

In its Office Action Response, Orbital traversed the rejections, on the basis that the references did not disclose all of the elements as described in the Office Action and that the references could be combined in the way suggested by the Examiner only through the use of impermissible hindsight. Orbital discussed Tomofuji based on the English language abstract and drawings that had previously been provided. A0605-06.

The Examiner subsequently issued a Final Office Action, continuing the rejections outlined in the first. A0637-82. No Tomofuji translation was made part of the file wrapper during reexamination.

### E. Orbital's PTAB Appeal And The Examiner's Machine Translation of Tomofuji

Orbital appealed to the Patent Trial and Appeal Board on the grounds that there was no prima facie case of obviousness, and the claims were patentable over the prior art of record. Orbital also argued that the rejections were improper if the Examiner was relying on a translation of the underlying Japanese text of the Tomofuji reference, when no translation was provided in the third-party Request, cited in the rejections, or put on record during prosecution. A0753-55.

An interview was held after Orbital submitted its Appeal Brief, before the Examiner's Answer. A0994-98. In the interview, Orbital maintained the right to

appeal on the issue of patentability, as well as the propriety of the rejections based on lack of a translation.  A0997.  Orbital also stipulated that – assuming proper procedures were followed – the Patent Office had discretion to reopen prosecution, but Orbital maintained that providing a translation of the Tomofuji reference in the Examiner's Answer, in connection with the appeal, was not an appropriate remedy to all the issues on appeal.  A0997-98.

Prosecution was not reopened.  Instead, the Examiner appended a machine translation of the Tomofuji reference to the Answer, arguing "since this is the first instance of this issue, making this translation of record overcomes [Orbital's] objection."  A1010.  The Answer also disclosed for the first time that – despite the initialed record showing only the English abstract of Tomofuji had been considered – a machine translation of the Tomofuji reference had actually been obtained prior to opening the reexamination and had been used to confirm the facts of the Order granting reexamination, and the rejections of Orbital's claims.  A1010-13.  The English abstract – the only Tomofuji document actually submitted with the Request, provided to Orbital, or cited in the SNQ determination – apparently had not been relied upon at all.  A1011 ("It is Examiners' further position that since Examiners have not relied upon the abstract of Tomofuji in any manner, the rejections are not improper or inappropriate under MPEP § 706.02(II).").

The Tomofuji machine translation relied upon by the Examiner contains a Notice that "[t]his document has been translated by computer. So the translation may not reflect the original precisely." The translation also indicates that "****" "shows the word which can not be translated." The translation carries a further disclaimer noting that the Japan Patent Office and translation service "are not responsible for any damages caused by the use of this translation." A1079. In addition to containing numerous untranslatable words and phrases, the translation fails to follow many English conventions regarding grammar or sentence structure. A1079-83. For example:

> [0003] On the other hand, these days, it not only uses a tank only for breeding of mere aquarium fish, but, The tendency to utilize the use as a room interior design is increasing, and using for propagation of various kinds of aquatic plants, etc. broadly etc. therefore, the light for tanks, Rather than the light currently used for the conventional tank for aquarium fish, the number of a fluorescent lamp is increased and a thing bright [one layer of reliances] has come to be called for.

A1079.

> [0016] The internal circumference edge 20a of a size where the insertion hole 20 established at some light coverings 3 drops and puts the periphery edge of the air discharge board 21 of the fan motor upper part in the cooling system of this working example, **** 20b which supports the periphery edge of the air discharge board 21 attached around this internal circumference edge 20a bottom, Consist of the notch 23 provided in the predetermined interval position of this **** 20b, and said air discharge board 21 has the knob part 25 or the coin insertion groove 35 for rotatably operating in the center section, and. The periphery rear face of the air discharge board 21 is equipped with the **** notch 23 of said insertion hole 20, and the lock protruding piece 26 of the shape of ******** which fits in.

A1081-82.

The Board affirmed the Office's reexamination Order. A0018-56. First, the Board found that – despite raising the issue in its Response to the first Office Action and despite having no notice that the Examiner had relied upon a translation – Orbital had waived any objection based on the translation issue. Second, the Board found that neither the Requestor nor the Examiner were required to provide a translation of Tomofuji, or even to notify Orbital that the Examiner had obtained and relied upon a translation for its rejections. A0023 ("The applicable statute, 35 U.S.C. § 303(a), does not require a translation to be cited or supplied . . . The translation is merely evidence of what the patent discloses and does not alter the citation of the patent.") Finally, the Board affirmed the Examiner's finding that the combinations of prior art cited in the rejections rendered obvious claims 1-7 and 15-18 of the '008 patent. The Board denied Orbital's request for rehearing, *see* A0002-16, and Orbital timely appealed.

## SUMMARY OF THE ARGUMENT

The anonymous third party request for *ex parte* reexamination is a powerful weapon, and should be carefully regulated. While promoting the public interest in maintaining patent quality is a laudable goal, the reexamination statutes and regulations must also be read to protect legitimate patent holders from harassment and to avoid the tremendous costs to the Office of prosecuting unreasonable

requests for reexamination. Thus, the statutes and regulations provide minimum requirements that a Requestor must satisfy before the Office will assign a filing date; rules that an Examiner must follow to afford the patent holder a fair opportunity to respond during prosecution of a reexamination; and legal standards for obviousness designed to prevent hindsight reconstruction of an invention using the prior art.

Those statutes, regulations, rules, and legal standards were ignored multiple times in the conduct of the reexamination of the '008 patent. The net result was a woefully unclear and incomplete record and an unfair deprivation of Orbital's right to respond effectively to the Examiner's rejections.

First, by failing to provide an English language translation of a primary prior art reference, Tomofuji, the Requestor did not satisfy the requirements of 37 C.F.R. § 1.510(b). As a result, the Office erred when it granted the reexamination request a filing date. *See* 37 C.F.R. § 1.510(c), (d); MPEP § 2227.

Second, having failed to vacate the filing date, and having informed Orbital through the IDS that no English translation of Tomofuji was considered, the Examiner should have provided Orbital with any translation he relied upon as evidence of Tomofuji's disclosures. At a minimum, the Examiner should have notified Orbital that he had obtained and was relying on a translation. The Examiner's failure to do so violated the requirement that the Examiner provide a

clear record and a clear description of the pertinence and manner in which a reference supported the rejection and deprived Orbital of a fair opportunity to respond to the rejections. *See* 37 C.F.R. § 1.104(c)(2); MPEP §§ 706.02(II), 2143.

Third, the Examiner erred when he relied on a machine translation of Tomofuji which warns, on its face, that it "may not reflect the original precisely" and disclaims any responsibility for damage arising from use of the translation. Key portions of the translation contain words that could not be translated or are otherwise incomprehensible. The Board should have held that the translation could not constitute substantial evidence of Tomofuji's content sufficient to support a finding of obviousness. *See Ex Parte Rudd*, No. 2007-3775 (PTAB June 25, 2008), A1304-09.

Fourth, the Board erred when it found that Orbital had waived its objections based on the unreliable content and procedural errors surrounding the Tomofuji translation. The plain language of the *SNQ Clarification*, Fed. Reg. Vol. 75, No. 122 (June 25, 2010), applies only to objections to the "SNQ determination," and does not require a patent holder to request reconsideration of procedural issues (particularly those which the patent holder did not appreciate as an issue at the time).

Finally, substantial evidence does not support the Examiner's prima facie case of obviousness. As described above, the only evidence of the content of

Tomofuji – on which every rejection relies – is an unreliable and in some instances incomprehensible machine translation. Even accepting the machine translation, Tomofuji teaches a mounting configuration that is materially different from that claimed in the '008 patent; the prior art as a whole leads away from the need to cool an LED light source of the kind claimed in the Orbital patent, and there is an insufficient basis on which to find a motivation to combine the cited references.

Accordingly, the Board's decision should be reversed, and the '008 patent claims should be upheld. Alternatively, the Court should remand the case for further prosecution, ordering the Office to issue a Decision Vacating Filing Date, and requiring the anonymous third party Requestor to comply with all filing requirements by providing a translation of Tomofuji. At a minimum, the Court should remand the case and order the Office to obtain and provide to Orbital a competent translation of Tomofuji and, in the event the Office maintains the rejections, to clearly articulate its reasoning in a non-final Office Action.

## ARGUMENT

## I. STANDARD OF REVIEW

Statutory interpretation is a question of law, reviewed *de novo*. *In re Kathawala*, 9 F.3d 942, 945 (Fed. Cir. 1993) ("the plain and unambiguous meaning of a statute prevails in the absence of clearly expressed legislative intent to the contrary"); *In re Donaldson Co.*, 16 F.3d 1189, 1192–93 (Fed. Cir. 1994) (en

banc). Substantial deference is afforded to the Patent Office's interpretation of its own regulations, unless plainly erroneous or inconsistent with the regulation in situations of ambiguity. *In re Lovin*, 652 F.3d 1349, 1353 (Fed. Cir. 2011).

Obviousness under 35 U.S.C. § 103(a) is a question of law,[5] based on underlying findings of fact. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *In re Baxter*, 678 F.3d at 1361. Differences between the claimed invention and the prior art, and what a reference actually teaches, are questions of fact. *Id.*; *Rapoport v. Dement*, 254 F.3d 1053, 1060–61 (Fed. Cir. 2001). The Board's legal determinations are reviewed *de novo*, and its factual findings for substantial evidence. *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012).

## II. THE EXAMINER'S FAILURE TO PROVIDE A COMPETENT TRANSLATION OF TOMOFUJI DURING REEXAMINATION JUSTIFIES REVERSAL OF THE BOARD'S DECISION

The series of errors committed first by the Requestor, and then by the Examiner, with respect to the primary prior art reference relied on by the Examiner in invalidating Orbital's '008 patent claims made it impossible for Orbital to receive fair consideration of its claims on reexamination. Orbital therefore respectfully requests that the Court reverse the Board's decision.

---

[5] The '008 patent was filed before March 16, 2013, and pre-AIA 35 U.S.C § 103(a) applies. Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 3(c), 125 Stat. 284, 293 (2011).

A.    **The Office Erred When It Proceeded With Reexamination Despite The Requestor's Failure To Satisfy The Minimum Request Requirements**

The plain language of 35 U.S.C. § 302 sets a minimum bar for access to the reexamination process.  The Patent Office has added further constraints when the Request relies on foreign language references under 37 C.F.R. § 1.510.  Thus, any request for reexamination under 35 U.S.C. § 302 must include (1) a statement pointing out each substantial new question of patentability based on prior patents and printed publications, and (2) a detailed explanation of the pertinence and manner of applying the cited prior art to every claim for which reexamination is requested.  37 C.F.R. § 1.510(b).  In addition, the request must include (3) "A copy of every patent or printed publication relied upon or referred to in paragraph (b)(1) and (2), accompanied by an English language translation of all the necessary and pertinent parts of any non-English language patent or printed publication." *Id.*

There is no question that the anonymous third party Requestor did not satisfy the requirements of 37 C.F.R. § 1.510(b).  The Requestor indicated in its cover sheet that it had provided a translation of all "necessary and pertinent" parts of foreign patent documents.  A0130.  With regard to Tazawa and Masuda, the Requestor submitted a full English translation and indicated as much on its IDS.  With regard to Tomofuji, however, the Requestor submitted only the English abstract, indicating no translation of the text on its IDS.  A0193.  Thus, the

anonymous third party Requestor failed to meet the minimum requirements for

requesting reexamination of the '008 patent under 37 C.F.R. § 1.510(b).

> As a result, the reexamination should not have been granted a filing date:

> (c) If the request does not . . . meet all the requirements by paragraph (b) of this section, then the person identified as requesting reexamination will be so notified and will generally be given an opportunity to complete the request within a specified time. Failure to comply with the notice will result in the *ex parte* reexamination request not being granted a filing date . . . .

> (d) The filing date of the request for *ex parte* reexamination is the date on which the request satisfies all the requirements of this section.

37 C.F.R. § 1.510(c), (d). *See also* MPEP § 2227 ("It is to be noted that a single

failure to comply with the 'Notice of Failure to Comply with *Ex Parte*

Reexamination Request Filing Requirements' ordinarily will result in the

reexamination request not being granted a filing date."). If the Examiner did not

discover the non-compliance until after the control number and filing date had

been assigned, the Office should have issued a Decision Vacating Filing Date. *See*

MPEP § 2227. The Office erred when it allowed the reexamination to proceed

without requiring the Requestor to satisfy the statutory and regulatory

requirements.

The error was not harmless. As discussed more fully below, Orbital *never*

received the translation to which it was entitled during the reexamination process,

and the translation was not made part of the file wrapper. The error was

compounded when the Requestor and Examiner provided Orbital with an IDS indicating that no translation of Tomofuji was considered. At no point in the reexamination was Orbital clearly informed that the Examiner was consulting a translation – much less an incomplete and in some instances incomprehensible machine translation – to determine the teachings of the key prior art reference at issue in the reexamination. By withholding a translation that was necessary and pertinent to each and every one of the proposed rejections, the anonymous third party virtually guaranteed that the basis for the reexamination and subsequent rejections would not be clear. Had Orbital been apprised of the translation before the Examiner issued a Final Office Action, Orbital may have modified its arguments, obtained a more reliable translation of Tomofuji, or amended its claims. The Office's failure to follow its own regulations deprived Orbital of the opportunity to respond appropriately.

Accordingly, the Examiner committed error by proceeding with the reexamination based on a Request that did not meet the minimum statutory and regulatory standards. The appropriate remedy for the error is reversal of the decision and remand to the Office, to allow it to issue a Decision Vacating Filing Date.

**B.** **The Office Erred When It Relied Upon A Translation Of Tomofuji, Without Providing A Copy Of The Translation Or Notice Of The Reliance To Orbital**

The third party Requestor's error was compounded by the Examiner's subsequent failure to provide Orbital with the translation upon which he relied or, at a minimum, to notify Orbital that the Examiner was relying on such a translation. A patent owner is entitled to a clear record as to whether the examiner is relying upon the abstract or the underlying full text document to support a rejection. MPEP § 706.02(II). Further, the patent owner is entitled to a clear description of the pertinence and manner in which each cited reference is used by the examiner to support a rejection. *See* 37 C.F.R. § 104(c)(2); MPEP § 2143(I)(A).

Here, the Examiner obtained and relied upon the translation, while at the same time communicating to Orbital through the IDS that he was relying only on the English abstract. Under such circumstances, the Examiner is required to provide the translation relied upon, or at a minimum to provide a new IDS or some other document clearly indicating reliance on the translation. By failing to do so, the Examiner deprived Orbital of a "clear record as to whether the examiner is relying on the abstract or the underlying full text document to support a rejection," as well as a clear description of the pertinence and manner in which each cited reference was used by the examiner to support each rejection.

In rejecting Orbital's appeal, the Board stated that the Examiner had no duty to cite or supply the translation, noting the absence of an express requirement in 35 U.S.C. § 303(a) that an examiner do so.  A0023.  While the statute itself is silent on the issue, surely the Examiner is not allowed to tell the patent owner in one communication – here, the IDS – that he did not rely on a translation, while at the same time obtaining and relying on a translation to support rejections.  Such a reading of the statute would violate a basic premise of the examination process – that the patent owner is entitled to a clear description of the manner in which each cited reference supports a rejection.  In the context of patent examination, an examiner who initially relies on an abstract, and later obtains the full document and translation, is instructed to supply the patent applicant with "the full text document and a translation (if not in English) . . . in the next Office action."  MPEP § 706.02(II).  There should be no distinction in this regard between initial examination and reexamination.

### C.  The Machine Translation of Tomofuji Cannot Support The Examiner's Finding Of Obviousness

All nine rejections rely on Tomofuji as the primary prior art reference.  However, even if the Examiner had provided Orbital with the translation during prosecution, the machine translation of Tomofuji cannot support the Examiner's finding of obviousness, because the translation is not reliable evidence of the Tomofuji disclosures:

- The face of the document warns that the translation "may not reflect the original precisely."

- The translation contains a disclaimer that the JPO and translation service "are not responsible for any damages caused by the use of this translation."

- Words that could not be translated are replaced with asterisks (****).

- The translation appears to be a literal translation into English from Japanese, resulting in a document with numerous errors, some rendering entire passages incomprehensible.

A1079-1083.[6]

In a similar case, the Board criticized the Examiner for his rejection of patent claims based on a machine translation of a Japanese patent, which contained warnings that it "may contain errors," and that the JPO and drafters "are not responsible for the result" of the translation; included "[u]ntranslatable words [] replaced with asterisks"; and was "replete with grammatical and idiomatic errors," rendering parts of the machine translation "unintelligible to us." *See Ex parte Rudd*, No. 2007-3775 at 2-3 (PTAB June 25, 2008), A1305-06. In *Rudd*, the Board remanded and directed the Examiner to "consult the translators in the Translations Branch of the Scientific and Technical Information Center," and obtain written translations into English. *Id.* at 5, A1308. On remand, the Examiner rejected the claims again, but the Board reversed, finding that the claims were

---

[6] Compare the machine translation of Tomofuji with the Tazawa and Masuda translations, which are reasonably intelligible, idiomatic and grammatical, and does not have untranslated words, or a disclaimer. *See* A0231-34; A0280-84.

patentable over full text, non-machine, reliable translations of the underlying
Japanese-language references. *See Ex Parte Rudd*, No. 2008-006250 at 4-5 (PTAB
July 15, 2009) A1310-15.

In this case, Orbital disputes that Tomofuji teaches a cooling system that
would have any effect on an LED light engine, if Tomofuji's fluorescent lights
were replaced with LEDs as the Examiner suggests. To understand how the
Tomofuji airflow and mounting configuration actually differ from the '008 patent,
Orbital referred to the corresponding description of these additional structures in
the machine translation. In particular:

> The periphery rear face of the air discharge board 21 is equipped with
> the **** notch 23 of said insertion hole 20, and the lock protruding
> piece 26 of the shape of ******* which fits in.

Also:

> It holds to the angular position which the lock protruding piece 26 of
> the shape of ****** which made the periphery rear face of the air
> discharge board 21 project can insert in in the notch 23 of insertion
> hole **** 20b corresponding, respectively[.]"

A1081-82. Unfortunately, because of the numerous untranslatable words, these
portions of the machine translation do not clearly describe the scope and content of
the prior art, or allow a reader to ascertain the differences between the prior art and
the invention, in a way that would show whether a person of ordinary skill might
have thought the claims would have been obvious under 35 U.S.C. § 103. *See,
e.g., Graham,* 383 U.S. 1 at 17 ("Under 103, the scope and content of the prior art

are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.").

Had the Examiner provided the translation to Orbital during prosecution of the reexamination, Orbital could have objected to the translation at that time, or at least had the opportunity to obtain its own competent translation to be entered in the record, before the close of prosecution. As it stands, however, the machine translation does not clearly define the scope of the Tomofuji reference, or allow the differences between Tomofuji and the claims to be ascertained. The Board should thus be reversed, and the claims should be allowed, or remanded for the Examiner to obtain a written English translation of the Tomofuji reference from the Translations Branch.

### D.   Orbital Did Not Waive Its Objections To The Translation Issues

At the Examiner's urging, the Board found that Orbital had waived any objection to the conduct of the reexamination on two bases. First, the Board found that Orbital was required to request reconsideration of the SNQ determination, based on the *SNQ Clarification* (*Clarification of the Procedure for Seeking Review of a Finding of Substantial New Question of Patentability in Ex Parte Reexamination Proceedings*, Fed. Reg. Vol. 75, No. 122 (June 25, 2010)). A0023-24. Second, the Board found that Orbital had not requested a translation from the Examiner during the reexamination, and therefore, the Examiner's provision of the

translation with its Answer on appeal cured any error that may have occurred below. Neither argument has merit.

Orbital did not waive its objection to the Requestor's failure or the Examiner's actions by failing to request reconsideration. This is not an issue regarding the *sufficiency* of the SNQ, which may have required Orbital to request reconsideration before the Examiner as provided in the *SNQ Clarification*. The *SNQ Clarification* addresses preservation of rights only with regard to the "SNQ determination." It does not address every procedural impropriety that could arise regarding the Request, and more specifically, it does not address the Office's obligation to ensure that the Request meets the minimum standards to be assigned a filing date.

Nor should Orbital be deemed to have waived its objections by failing to request a translation during prosecution. The Requestor represented that it had provided all "necessary and pertinent" English translations. The Requestor's IDS indicated that it had included a translation of Tazawa and Masuda, but only an English language abstract for Tomofuji. The Requestor did not cite to any of the text of the Tomofuji patent. Similarly, the Examiner initialed the IDS, indicating that Tomofuji had been considered without a translation, and cited only the English abstract and the drawings in the SNQ. Those facts led Orbital to the reasonable conclusion that all of the "necessary and pertinent parts" of Tomofuji were found

in the abstract, or perhaps in the drawings. It was also reasonable for Orbital to assume that, if the Examiner later obtained (or, in this case, had already obtained) a translation, the translation would be provided to Orbital in the next Office Action. *See* TMEP § 706.02 (II) (While it may be appropriate for an examiner to make a rejection in a non-final Office action based in whole or in part on the abstract of a foreign language document, "[i]n such circumstances, the full text document and a translation (if not in English) may be supplied in the next Office action.").

If, as the Board and Examiner apparently believe, a patent owner is required to request from the Examiner a translation of every foreign language document – regardless of whether the Requestor or Examiner appear to have relied on the document – then the rules should make clear that such a burden falls to the patent owner. Until such point, it would be unjust to find that Orbital waived its objection to a translation that it did not know existed, that was never made of record in the reexamination proceeding, and was not provided to Orbital until after prosecution had closed and Orbital filed its appeal brief.

## III. THERE IS NO PRIMA FACIE CASE OF OBVIOUSNESS, AND THE BOARD SHOULD BE REVERSED

To support a rejection of a patent claim under 35 U.S.C. 103, there must be a clear articulation of the reasons why the claimed invention would have been obvious. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 538, 418 (2007). The Office bears the initial burden of establishing a prima facie case, by showing that the prior

art would appear to have suggested the claimed subject matter, to a person of ordinary skill in the art. *In re Rinehart,* 531 F.2d 1048, 1052 (CCPA 1976). If this burden is not met, Orbital is not obligated to submit evidence or argument of patentability. See *In re Rijckaert*, 9 F.3d 1531, 1532 (Fed. Cir. 1993) ("Only if that burden [of establishing a prima facie case] is met, does the burden of coming forward with evidence or argument shift to the applicant."). *See also* MPEP § 2142 ("Legal Concept of Prima Facie Obviousness").

This burden was not met by the Office during prosecution of the '008 patent reexamination, and each and every one of Orbital's claims 1-7 and 15-18 should be allowed over the prior art.

### A. All Of The Proposed Rejections Of Orbital's Claims Rely On The Same Structure And Do Not Reproduce The Claimed LED Light Mounting Configuration

In both initial Office Action and the Final Rejection of Orbital's claims, the Examiner carried over the proposed rejections from the original third-party Request for *ex parte* reexamination. Tomofuji is the primary reference for each rejection, in combination with Kuiper, Lebens, Ignatius, Tazawa, Masuda, and Janssen. A0370; A0639. All of these different combinations result in materially the same structure; however, none reproduces the actual configuration of the invention as claimed.

Even if one were to replace Tomofuji's fluorescent lights 4, with the LEDs disclosed in the secondary references, Tomofuji's fluorescent lights 4 still do not correspond to the claimed position, "mounted to the inner side of the housing" or "disposed on an inner side of a housing" as recited in claims 1 and 15 of the '008 patent. Instead, Tomofuji's fluorescent lamps 4 are mounted to light reflector 7, as clearly shown in Figures 1–3 of Tomofuji, and this is different in both form and substance from the claimed structure. *See also* A1077-78; A1081.

More particularly, Tomofuji teaches that "operation switch room" 10 and "fan motor 14" are mounted to the claimed inner side of the housing, opposite the outer side and facing the open top of the marine environment, but neither of these structures is an "LED light source [or any light source] comprising at least one light engine having a plurality of individual LEDs capable of providing light at a wavelength from about 380 nm to about 690 nm," as recited in the '008 patent claim 1. Conversely, if an LED light source were used in place of Tomofuji's fluorescent bulbs 4, as suggested by the Board, the LED light source would be mounted to Tomofuji's light reflector 7, as shown in Figures 1–3, and this is not the same as being mounted to the inner side of a housing, opposite the outer side and facing the open top of a marine habitat, as specified in each and every one of Orbital's claims.

In short, the articulated rejections all depend on the replacement of Tomofuji's fluorescent lamps with LEDs; however, there is no substantial evidence that Tomofuji's fluorescent lamps 4 correspond to the position of the LED light source as claimed in the '008 patent.

## B.  The Difference Between The Claimed Invention And The Prior Art Is Substantial

The differences between the claimed mounting configuration and the Tomofuji reference are important for cooling and thermal management.  As shown in Figures 1 and 2 of the '008 patent (A1290-91), an LED light source mounted on the inner side of the housing provides a direct thermal path to the outer side, which is adjacent the inner side as described in claims 1 and 15.  Heat can thus dissipate from outside the housing, saving energy and reducing the thermal load.  *See* A1294.  This is similar to underwater embodiments of the invention, because the cooling also occurs via conduction, except that heat dissipation in the claimed configuration occurs over the greater surface area of the outer side of the housing. *See, e.g.,* A1295.

Tomofuji, by contrast, shows a light mounted to reflector 7, separated from the inner side of covering 3 by an air space, which is in fact a good insulator.  The Tomofuji system is also designed to generate airflow over fluorescent *bulbs* 4, because these are the heat source, but this configuration would have substantially no effect on an LED light engine, because the heat is not generated by the LED

bulbs themselves. In other words, airflow over the LED bulbs would have little to no cooling effect, and there is nothing in the Tomofuji cooling system showing how to dissipate heat generated by the driver electronics, including current drivers, light engine selection switches, and other electronic components that are not even present in Tomofuji's traditional fluorescent lighting system. *See* A0630; A1295; A1297 .

Because neither the third-party Request nor the ensuing Office Actions articulate how these difference could have been overcome by a person of ordinary skill, on appeal, Orbital was forced to rely on the machine translation of the Tomofuji specification itself to argue the differences between the claimed invention and the prior art; however, the machine translation presents numerous difficulties in this regard. Based on the machine translation, for example, reference 6 between light reflector 7 and the inner side of cover 3 is described as a "top power distribution part," but this in fact appears to be an air space, as described above. A1081. Similarly, to understand how the Tomofuji airflow and mounting configuration actually differ from '008 patent, Orbital turned to the corresponding description of these additional structures in the machine translation. In particular:

> The periphery rear face of the air discharge board 21 is equipped with the **** notch 23 of said insertion hole 20, and the lock protruding piece 26 of the shape of ******* which fits in.

Also:

> It holds to the angular position which the lock protruding piece 26 of the shape of ****** which made the periphery rear face of the air discharge board 21 project can insert in in the notch 23 of insertion hole **** 20b corresponding, respectively[.]"

A1081-82. The Examiner cannot possibly support a prima facie case of obviousness based on such disclosures, or adequately explain how the Tomofuji cooling system, configured as described by Tomofuji, would result in the claimed '008 patent invention.

### C. Where The References Lead Away From The Proposed Reconstruction Of The Invention As Claimed, There Is No Burden On Orbital To Show That The Prior Art Would Never Use The Claimed Cooling System

The Tomofuji reference is directed to cooling a fluorescent light system, which is a very different problem from cooling an LED light engine, as described in the '008 patent. As best as can be discerned from the Tomofuji machine translation, the problem was to design a cooling device so that even if the temperature rises abnormally high, heated air is forceably exhausted from the aquarium cover "to prevent illuminator damage and/or fire accident," or "the problem of becoming a generation cause of fire." A1073; A1079. Kuiper, by contrast, teaches that LEDs "save an enormous amount of energy, in comparison with normal sources of artificial light," which "convert a large part of the energy

supplied to them into heat." A0221. Similarly, Tazawa teaches an LED lighting system that "generates little heat." A0232.

Whatever else the Tomofuji machine translation may teach, "generates little heat" and "save enormous amounts of energy," as taught by Kuiper and Tazawa, would not lead a person of ordinary skill toward any obvious need for cooling an LED light source in order to prevent fire accident, as described by Tomofuji. In reply, the Examiner argues: "There is no basis to assume (as Appellant does herein) that simply because Kuiper notes that LEDs produce less heat then it would never use a cooling system." A1024.

This presents a situation similar to the one in *In re Giannelli*, where the Board maintained a rejection because the applicant was unable to show that a chest-press machine could not be used to perform the claimed rowing exercise. *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014). As noted by the Court in reversing the decision, the test for obviousness is not physical capability alone, and like the applicant in *Giannelli*, Orbital is under no obligation to provide evidence that Kuiper and Tazawa "would never use a cooling system," until it is first explained why a person of ordinary skill in the art would obviously have modified either of these references to include cooling in the first place. *See id.* at 1380 ("because the initial burden was not met, Giannelli was not obligated to submit

additional evidence to rebut the examiner's findings") (citing *In re Rijckaert*, 9 F.3d at 1532).

For cooling, the Board also turns to Ignatius, but Ignatius teaches a high voltage (+180 volt) LED array that is "preferably covered with a glass cover to protect it from the environment." A0274.[7] This contrasts with the much lower voltage (+24 volt DC) LED light engine of the '008 patent, which is specifically designed to improve safety in open-top marine applications, with less heat dissipation. A1295.

The Board affirmed the Examiner's argument that "Ignatius and Kuiper both suggest that an LED strip, panel, or substrate, easily could have been employed in place [of] the fluorescent lamps of Tomofuji." A0043. But the fact that something is merely capable or "easily could have been employed" does not make it obvious under 35 U.S.C. § 103(a), if the prior art indicates that it might not have been such a good idea in the first place. *See In re Giannelli*, 739 F.3d at 1380 ("Physical capability alone does not render obvious that which is contraindicated.").

All of the Board and Examiner's arguments have the same intent, which is to show obviousness by arguing that Orbital cannot prove the proposed configurations would not work. But the Kuiper and Tazawa teachings to

---

[7] Ignatius is not relied upon for structure, only for the teaching that "it is well known to use a cooling system in housings for LEDs." A1025.

"generate[s] little heat" and "save enormous amounts of energy" do not obviously lead to cooling, and where Ignatius is the only other reference that includes this feature, the fact that Ignatius utilizes a +180 volt, high intensity LED that should preferably be protected from the environment would not be lost on a person of ordinary skill, interested in open-top salt water aquarium applications.  Absent substantial evidence in the record to show why a person of ordinary skill would obviously have ignored all of these teachings in order to reproduce the claimed invention nonetheless, there is no prima facie case of obviousness, and the Board should be reversed.  *See also*, *e.g.*, *Ex Parte Giannelli*, No. 2013-1167 at 9 ("…a sure-fire way to cause injury is to use a machine in a manner not intended by the manufacturer").

## CONCLUSION

The Office committed multiple procedural and substantive errors which should have been reversed by the Board.  Accordingly, Orbital respectfully requests that the Court reverse the Board's decision and uphold the '008 patent claims.  Alternatively, the Court should remand the case for further prosecution, ordering the Office to issue a Decision Vacating Filing Date, and requiring the anonymous third party Requestor to comply with all filing requirements by providing a translation of Tomofuji.  At a minimum, the Court should remand the case and order the Office to obtain and provide to Orbital a competent translation

of Tomofuji and – in the event the Office maintains the rejections – to clearly

articulate its reasoning in a non-final Office Action.

Respectfully submitted,

DORSEY & WHITNEY LLP

Dated:  April 21, 2014

By _/s/ Heather D. Redmond_____
      Heather D. Redmond
      Nathaniel P. Longley
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

**Attorneys for Appellant**
**Orbital Technologies Corp.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 21, 2014, a true and correct copy of the

foregoing was served upon the following counsel of record via email through the

court's CM/ECF system:

> Nathan K. Kelly, Solicitor
>    nathan.kelley@uspto.gov
> Jeremiah Helm
>    jeremiah.helm@uspto.gov
> Farheena Yasmeen Rasheed
>    farheena.rasheed@uspto.gov
> United States Patent and Trademark Office
> Office of the Solicitor

  <i>/s/ Heather D. Redmond</i><br>Heather D. Redmond

# <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rules of

Appellate Procedure 32(a)(7)(B).  The brief contains 9,268 words, excluding the

parts of the brief exempted by Federal Rule of Appellate Procedure

32(a)(7)(B)(iii).


                                     */s/ Heather D. Redmond*

                                     Heather D. Redmond

                                     *Attorneys for Appellant*

                                     *Orbital Technologies Corp.*

# Addendum

# TABLE OF CONTENTS FOR ADDENDUM

Decision on Request for Rehearing ................................................................ A2-16

Decision on Appeal .......................................................................... A18-57

U.S. Patent No. 7,473,008 B2 ................................................ A1288-1298

Ex Parte Reexamination Certificate for
U.S. Patent No. 7,473,008 C1 ................................................ A1299-1303

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* ORBITALTECHNOLOGIES CORPORATION.

---

Appeal 2013-004262
Reexamination Control No. 90/011,864
United States Patent 7,220,018 B2
Technology Center 3900

---

Before KARL D. EASTHOM, KEVIN F. TURNER, and
BRUCE R. WINSOR, *Administrative Patent Judges.*

EASTHOM, *Administrative Patent Judge.*

DECISION ON REQUEST FOR REHEARING

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

Orbital seeks relief in its *Request for Rehearing, see*
37 C.F.R. § 41.52, from the Patent Trial and Appeal Board Decision
(March 27, 2013) affirming the Examiner's decision to reject claims 1-8 of
the '018 Patent, U.S. 7,220,018 B2, *Marine LED Lighting System and
Method* (May 22, 2007). (*See* Reh'g Req. 1, 14-16.)

In a rehearing request, appellants have the burden to "state with
particularity the points believed to have been misapprehended or overlooked
by the Board." 37 C.F.R. § 41.52 (a)(1). Orbital has not made the requisite
showing.

Orbital asserts that the Board overlooked or misapprehended points
concerning the Examiner's determination of a substantial new question of
patentability (SNQ) and obviousness. Orbital explicitly requests the Board
to vacate the "*SNQ Order*"[1] and implicitly requests the Board to alter its
conclusion of obviousness. (*See* Reh'g Req. 15-16.)

This appeal relates to another Board appeal, PTAB Appeal No. 2013-
004264, for which Orbital also seeks rehearing, involving another of
Orbital's patents, U.S. 7,473,008 B2. That rehearing decision issues
concurrently herewith and is adopted and incorporated herein by reference.

We deny the requested relief.

*Background*

As the Decision notes, the '018 Patent describes a marine habitat LED
(light emitting diode) lighting system. (Dec. 1.) Figure 1 of the '018 Patent
depicts a housing 10 covering marine habitat 17 as shown below:

---

[1] *Order Granting/Denying Request for Ex Parte Reexamination*
(Sept. 8, 2011).

A0003

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2



The housing includes air inlet vents 18 and fans 16. An LED array (undepicted) is attached to the underside of housing 10 to light the marine habitat 17. (*See* Dec. 1.)

*Obviousness*

Orbital does not direct attention to a particular claim. According to Orbital, Orbital's contentions show that the Board overlooked Orbital's argument that "modifying Tomofuji to use an LED lighting system [as the Examiner proposes] . . . would render Tomofuji unsatisfactory for its intended purpose and change its principle of operation." (*Id.*)

Orbital contends that "the purpose of Tomofuji's cooling system is to 'prevent illuminator damage and/or fire accident,' even if the temperature inside the cover 'rises abnormally high due to e.g. lighting of an illuminating lamp.'" (Reh'g Req. 14 (quoting Tomofuji, Abstract).) Orbital also contends that "LED [lights] . . . generate little heat," so "Tomofuji's cooling system would not obviously . . . prevent fire," if used to cool LEDs. (Reh'g Req. 14.)

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

The Decision discusses part of the Examiner's obviousness rationale
as follows:

> The Examiner finds and reasons that replacing Tomofuji's
> fluorescent lights with Kuiper's LEDs would have been
> obvious for the purpose of saving energy and to promote or
> prohibit various forms of aquatic plant growth as Kuiper
> teaches. The Examiner employs Lebens to further suggest a
> power supply for the LEDs and finds that the Tomofuji and
> Kuiper systems must inherently operate with power supplies.
> The Examiner also points out that cooling LED systems was
> well known in the art as evidenced by Ignatius's teachings.

(Dec. 19 (citing Ans. 42-43).)

Orbital does not challenge the Board's fact finding repeated *supra* that
"cooling LED systems was well known in the art as evidenced by Ignatius's
teachings." Orbital also does not challenge the Board's reasoning and fact
finding that "[s]killed artisans, given the combined teachings, would have
recognized that enough LEDs at a sufficient size or power for a desired
application necessarily would create heat which would require cooling."
(Dec. 20.)

A central purpose behind Tomofuji's lighting system is to provide
lighting, i.e., *inter alia*, "to illuminate[] the fishes in a tank," and also "to
utilize the [light] as a room interior design." (*See* Tomofuji ¶¶ 2-3.) Of
course, the purpose of the cooling system is to cool the tank. Cooling a tank
that has a sufficient number of LEDs to light a tank, or a tank and a room,
would not change Tomofuji's principle, which involves lighting and cooling,
or render the lighting and cooling system unsatisfactory for its intended

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

purpose of lighting and cooling. Consequently, Orbital fails to show an overlooked point concerning obviousness.

> *SNQ*

Orbital characterizes the translation as "additional art" that cannot be used if not originally cited in, or provided with, the *SNQ Order* (*supra* note 1) according to *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379 (Fed. Cir. 2012) and *In re Baxter Travenol Labs*, 952 F.2d 388, 390 (1991). (*See* Reh'g Req. 4, 12-13.) The Decision addressed various forms of the argument, reasoning that the translation, or the abstract, is not "additional art":

> As the Examiner recognizes, the "translation merely confirms the facts of the reference relied upon." (Ans. 12.) Such evidence is proper in a reexamination proceeding to show what the document teaches. *Cf. In re Baxter Travenol Labs*, 952 F.2d 388, 390 (1991) (extrinsic non-prior art declaration evidence can be used to show the material impliedly disclosed in a prior art document – evidence shows what those of skill in the art would have recognized as disclosed in the prior art reference). Orbital does not explain how the outcome would have been different had a translation been provided in the *SNQ Order.*

(Dec. 6-7.)

Orbital also argues that the Board should vacate the reexamination because the Examiner relied upon a machine translation of Tomofuji, but the Examiner did not supply the translation to Orbital, until after Orbital asked for a translation, which occurred after the final rejection. (*See* Ans. 3, n. 1, 7; Dec. 8 (citing Ans. 3, Reply Br. 11).) Orbital also argues that it did not waive the SNQ issue, as the Decision and the Examiner find, because

5

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

Orbital did not know the Examiner used a translation until at some point during prosecution after the *SNQ Order*. (*See* Reh'g Req. 4, 7-9.)

As the Decision notes, the record does not support Orbital's lack of knowledge theory. Orbital acknowledges that the Examiner's *SNQ Order* indicates that the Examiner provided an English translation. (Dec. 8.) The applicable portion of the *SNQ Order* follows:

### *Submitted Prior Art in the Request*

The substantial new question of patentability (SNQ) consideration is based on the following references:

Japanese Patent No. 9-308409 to Tomofuji English Translation is provided herewith (hereinafter "Tomofuji").

(*See SNQ Order* 2.)

As the passage shows, as Orbital argues in its Reply Brief, and as the Decision notes, the *SNQ Order* indicates that the Examiner relied upon a translation, even if there were conflicting indications that the Examiner did not. Orbital also maintains that "[b]ased on the continuing record . . . elements of the underlying Tomofuji reference were discussed, and these elements were not found in the English language abstract that was provided with the Order." (Reh'g Req. 5.) These factors, independently or together, should have indicated to Orbital that the Examiner relied upon a translation and that the translation, to a Japanese language document, was an issue.

Orbital did not ask for a translation after receiving the *SNQ Order*, and waited until it filed its Appeal Brief to raise an issue about a lack of a translation to the Examiner. As the Decision notes, "Orbital does not apprise the Board of persuasive authority for granting relief based on waiting

6

**A0007**

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

for something which was not requested." (Dec. 9.) Orbital also does not dispute the finding that it could have obtained a free machine translation on a website or otherwise obtained a translation. (*See* Dec. 9; Reh'g Req. 8 (Orbital admits that "[a]gain, there is no dispute as to whether patentee could have obtained a different translation through other means.").)

Orbital now argues that it did not waive the SNQ issue by failing to raise it before the appeal, because the Examiner and the Board "do[] not explain how the patentee should have known to demand a translation." (Reh'g Req. 4.)[2] However, the *SNQ Order* itself, or the other factors noted, including the Japanese language document, indicate that a translation would be used by the Examiner. The *SNQ Order* puts Orbital on notice that the Examiner used a translation. The Japanese language document would have constituted a reasonable indication that a translation would be an issue.

Orbital essentially argues that an oversight by the Examiner, i.e., not providing the translation at the same time as the *SNQ Order*, should redound to a vacated procedure that began over two years prior. As the Decision explains, Orbital's tactical

> procedure not only would violate the clear guidance in the *SNQ Clarification*, it also would violate the clear statutory mandate requiring "all reexamination proceedings ... [to be] conducted with special dispatch within the Office." 35 U.S.C. § 305. For example, depending on the merits, an examiner might vacate an earlier SNQ order, and regardless of the merits, most likely would supply a translation if so requested in order to expedite prosecution.

(Dec. 11.)

---

[2] The Decision does consider the SNQ issue and other related issues in the alternative. (*See* Dec. 18.)

7

**A0008**

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

Further, according to the Examiner's Answer, after Orbital filed the Appeal Brief (August 16, 2012), the Examiner contacted "Appellant . . . on September 4, 2012 to discuss the procedural issue of how to make the translation of Tomofuji of record as discussed below. Appellant *agreed* to [have the Examiner] *add the translation* as an attachment to an Examiner's Answer, *rather than re-open prosecution*." (Ans. 3, n. 1 (emphasis added); *accord* Ans. 6).) The Examiner Interview Summary (interview Sept. 4, 2012, mailed Sept. 12, 2012) tracks the Answer:

> Examiner asked Mr. Longley . . . whether it would be desirable to attach the translation as an appendix to an Examiner's Answer or to re-open prosecution and provide it in a non-final rejection. Mr. Longley agreed to accept the translation as an appendix to an Examiner's Answer, but also recognized that is was within the discretion of the PTO to re-open prosecution.

The record reflects that Orbital elected to wait for the translation in the Answer. The Examiner added the translation and abstract to the Answer as an attachment, because Orbital declined the Examiner's offer to re-open prosecution.

Further, as the Decision notes, Orbital "*does not request that prosecution be reopened, further indicating that Orbital has not been prejudiced.*" (Dec. 16-17 (emphasis added).) Orbital states in its Appeal Brief:

> Nor would it be proper to reopen the reexamination merely to place a translation of the Tomofuji reference on record, because reopening prosecution to permit a new reexamination based on the same or similar art would not raise any substantial new question of patentability, and it would place an unreasonable and unjustifiable burden on the patentee to require an answer to such a proceeding under 37 C.F.R. § 1.515.

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

(App. Br. 62 (partially quoted in Dec. at 16.).)

     After the Appeal Brief and Examiner Interview Summary, but

before the Answer, Orbital filed a three-page Interview Summary

(October 2, 2011). In it, Orbital states, *inter alia*, the following:

> The Office has discretion to reopen prosecution
> after filing of the Appeal Brief, based on appropriate
> procedures as defined by the Board. Respectfully, Patent
> Holder's representative submits that if prosecution is
> reopened, the arguments in the Appeal Brief should be
> considered on the merits.

>     The Examiner's Interview Summary states that lack of
> translation for the Tomofuji reference is a procedural issue. . . .
> **This position is respectfully traversed**.

>    . . .To the contrary, where there is no translation . . . there
> is no prima facie case . . . .

>     The Examiner's Interview Summary states that
> Applicant's representative agreed to accept a translation of the
> Tomofuji reference in the Examiner's Answer. . . . **This
> position is respectfully traversed**.

>     *With all due respect, the Patent Holder reserves the right
> to appeal the Order granting the Request for Reexamination
> based on the prior art of record in the Order*, and providing a
> translation in Examiner's Answer is not a remedy for this issue.
> In addition, if a translation (or any other new evidence) is
> provided in Examiner's Answer, the Patent Holder respectfully
> requests justification under the rules of the Board, so that a
> proper response may be prepared. Further, the Patent Holder
> respectfully submits that any new evidence provided in the
> Examiner's Answer would constitute new grounds for rejection,
> and should be treated accordingly.

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

Patent Holder's Interview Summary 2 (last italicized emphasis added by the Board).

Hence, as the record shows, Orbital essentially sought to preserve its options: "Where the patent holder respectfully traverses any position stated in the Examiner's Summary, it is understood that this is done to preserve the Patent Holder's rights." *Id.* at 3. The record shows that Orbital chose the right to appeal to ask the Board to vacate the *SNQ Order*, instead of re-opening prosecution. (*See* Dec. 17.)

In its Reply Brief, armed with the Examiner's translation, Orbital chose to maintain its appeal, rather than seeking a remand. That is, assuming for the sake of argument that it was not too late to ask to re-open after having waived a chance to re-open and having denied the Examiner's offer, Orbital repeats the Examiner's statements in the Interview Summary and in the Answer. Orbital states that its

> Summary of Interview . . . expressly traverses any such characterization of Patentee's Position. *In particular, Patentees' Interview Summary acknowledges that the Office has discretion to reopen prosecution, but Patentee nonetheless explicitly reserves the right to appeal based on the lack of translation, including the right to appeal the Order granting the Request for Ex Parte Reexamination.*

(Reply Br. 11 (emphasis added).)

In other words, the record shows that Orbital "explicitly" maintained its appeal to the Board, even in the Reply Brief, after having waived a remand in its Appeal Brief, and after declining the Examiner's offer prior to filing its Reply Brief. Orbital does repeat, as noted *supra*, a portion of Patent Holder's Interview Summary, but that portion merely obliquely states a point of law: "any new evidence provided in the Examiner's Answer

10
**A0011**

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

would constitute new grounds of rejection, and should be treated accordingly."

Even if repeating portions of the Patent Holder's Interview Summary somehow constitutes a request to the Board to re-open prosecution, prior to that, Orbital rejected the Examiner's explicit offer to re-open prosecution. Therefore, Orbital waived the right to remand to address any due process or fairness issues that would have been mooted by accepting the explicit offer to re-open prosecution. Any due process concerns based on "new evidence" in the translation are intertwined with the SNQ issue, according to Orbital's arguments, which appear to be predicated, primarily, on alleged inconsistencies between the *SNQ Order* and the translation, as discussed below. Pursuant to the "special dispatch" mandate under 35 U.S.C. § 305, it would not be fair to the public, including other applicants, to allow Orbital to appeal to the Board for some issues and seek a remand for other intertwined issues. Orbital declined the offer by the Examiner for the same remedy, and the PTO expended valuable public resources in writing the Answer, docketing the appeal, and forming a Board panel to consider the myriad of appeal issues.

Moreover, Orbital chose "*explicitly* . . . to appeal based on the lack of translation, including the right to appeal the Order granting the Request for *Ex Parte* Reexamination." (Reply Br. 11.) Orbital also requested the Board to exclude the translation "from consideration in the reexamination," because it allegedly was not "considered in determining a substantial new question of patentability." (Reply Br. 17 (citing *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379 (Fed. Cir. 2012).) Orbital similarly disputed that the "machine translation . . . can be relied upon in maintaining any final

11

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

rejection . . . because the translation was not on record at the time the rejections were made final, and it was not on record when the reexamination was ordered." (Reply 18.)

However, as stated, the record reflects that the Examiner did consider the translation, and the Examiner offered to cure any deficiency of due process, fairness, or otherwise by making the final rejection a non-final rejection, but Orbital declined the offer. The record shows that Orbital did know about the translation prior to filing its Appeal Brief. (*See* App. Br. 62.) During a re-opened prosecution, which Orbital declined, Orbital could have addressed, before the Examiner, how the translation surprised Orbital, caused a material shift during prosecution, or otherwise prejudiced Orbital. During a re-opened prosecution, Orbital also could have followed the stated procedure for raising and preserving the SNQ question before the Examiner and the Director. (*See* Dec. 7 (discussing SNQ Clarification procedures to preserve SNQ issues).)

Orbital maintains that the Decision overlooks that the Examiner and Orbital do not agree on what Tomofuji teaches or discloses. (Reh'g Req. 10.) The Examiner "find[s] that Appellant provided a general outline of the features of Tomofuji which were consistent with the teachings relied upon by Examiners in the rejections." (Ans. 5.) If Orbital is correct, and the disagreement relates to the contents of the translation, this exemplifies why Orbital should have accepted the Examiner's offer to re-open prosecution.

To support its argument of a disagreement with the Examiner over what Tomofuji teaches, Orbital quotes a passage from the Decision that explains why there is no material inconsistency between the *SNQ Order* and the translation. (*See* Reh'g Req. 11 (quoting Dec. 13).) Orbital does not

12

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

describe how the passage from the Decision fails to describe Tomofuji's teachings accurately, or where Orbital disagrees with the facts. (*See* Reh'g Req. 10-11.)

The Decision generally finds that Tomofuji's figures depict a housing, a light source, and a cooling system, over a tank. (*See* Dec. 5-6.) Orbital repeats the Board's finding that in Tomofuji, "the 'light' 2 simply includes the housing cover 3 and the lamps 4 therein," and that the Examiner refers to the "light 2 as a housing." (*See* Reh'g Req. 11-12.) Orbital complains that "it is material to know whether the reference 2 of Tomofuji is relied upon as a housing or a light." (Reh'g Req. 11.) This argument exalts form over substance.

The housing cover 3, a part of the light fixture 2, reasonably corresponds to the "housing" recited in claim 1. The Abstract refers to a "cover" 3, and the translation similarly refers to "covering 3." (Tomofuji ¶ 20.) The translation refers to "fluorescent lamp 4" (*id.*), while the Abstract refers to "the cover of an illuminator." These documents do not conflict with one another in any material manner that has been identified by Orbital. Reliance on either one, or both, does not show an invalid SNQ, unfairness, or a lack of notice.

The Examiner's *SNQ Order* refers to a "housing 2 for a lighting system 4." (SNQ Order 7.) Tomofuji's Figure 1, which is the same figure depicted at the published Abstract, show numerals 2 and 3 side-by-side and pointing to the same area on the housing cover. Regardless of the particular numeral cited, Tomofuji's Figures 1-3 plainly show a housing within which reside lamps 4, corresponding to the claimed position of a "light source mounted to the inner side of said housing." Orbital does not dispute, with

13

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2

specificity, the Board's or the Examiner's findings as to what Tomofuji
materially teaches.

"All reexamination proceedings under this section, including any
appeal to the Board of Patent appeals and interferences, will be conducted
with special dispatch within the Office." 35 U.S.C. § 305. Of course, the
procedures must be conducted with fairness to applicants and the public,
while considering the special dispatch mandate. In this case, the record
shows that Orbital chose to maintain its appeal to the Board and wait for the
translation in the Answer, rather than accept the Examiner's offer to re-open
prosecution. Orbital fails to show that the Board overlooked or
misapprehended a material point in affirming the Examiner's decision to
reject the claims on appeal.

Pursuant to 37 C.F.R § 41.52 (a) (1), this Rehearing Decision is
designated to be a new rehearing decision only to the limited extent that it
discusses findings of record not explicitly recited in the Decision to show that
Orbital declined the offer by the Examiner to re-open prosecution and waived any
right, predicated on the translation, to a remand by the Board. Orbital on a
rehearing request, will have the right to point the Board "with particularity the
points believed to have been misapprehended or overlooked by the Board" in
making that finding. *See also* 37 C.F.R § 41.50 (d) ("The Board may order
appellant to additionally brief any matter that the Board considers to be of
assistance in reaching a reasoned decision on the pending appeal."). This
Rehearing Decision does not constitute a new ground of rejection.

## REHEARING DECISION

## DENIED

14
**A0015**

Appeal 2013-004262
Reexamination Control Nos. 90/011,864
Patent 7,220,018 B2


ak


Patent Owner:

Dorsey & Whitney, LLP – Minneapolis
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402-1498
Attn: Patent Prosecution Docketing Dept.
Intellectual Property Practice Group – PT/23rd FL

Third Party Requester:

Maurice U. Cahn
Cahn & Samules, LLP
1100 17th Street, NW
Suite 401
Washington, DC 20036

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex parte* ORBITAL TECHNOLOGIES CORPORATION

_____

Appeal 2013-004264
Reexamination Control No. 90/011,865
United States Patent 7,473,008 B2
Technology Center 3900

_____

Before KARL D. EASTHOM, KEVIN F. TURNER, and BRUCE R.
WINSOR, *Administrative Patent Judges.*

EASTHOM, *Administrative Patent Judge.*

DECISION ON APPEAL

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Appellant, Patent Owner Orbital Technologies Corporation, appeals under 35 U.S.C. §§ 134(b) and 306 from the Examiner's decision to finally reject claims 1-7 and 15-18 of U.S. 7,473,008 B2 *Marine LED Lighting System and Method* (May 22, 2007) (as originally issued and as amended in a prior Reexamination proceeding. (*See* App. Br. App'x A Claims.) Orbital also appeals the Examiner's determination of a substantial new question of patentability (SNQ). (App. Br. 12-13.) This appeal relates to another Board appeal, PTAB 2013-004262, involving another of Orbital's patents, U.S. 7,220,018 B2, which recites similar claims rejected for similar reasons. That decision issues concurrently herewith.

We have jurisdiction under 35 U.S.C. §§ 134(b) and 306.[1]

We AFFIRM.

## STATEMENT OF THE CASE

The '008 patent describes a marine habitat LED (light emitting diode) lighting system. (*See* '018 Abstract.) Figure 1 of the'008 patent depicts a housing 10 which covers a marine habitat 17 as shown below:



Figure 1

---

[1] *See also* attached *Delegation of Authority in Ex Parte Reexamination Proceeding Appeal* (Chief Judge James D. Smith delegating authority to the panel to review SNQ issues).

2

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

The housing of Figure 1 includes air inlet vents 18 and fans 16 to cool the LEDs. (*See* '008 patent, col. 4, ll. 19-33.) An LED array (undepicted) is attached to the underside of housing 10 to light the marine habitat 17. (*See* Fig. 2; App. Br. 9.)

The Examiner finally rejected claims 1-7 and 15-18 under 35 U.S.C. § 103(a) for obviousness as follows:

1. Claims 1 and 4-6 based on Tomofuji, JP 9-308409 A (Dec. 2, 1997), Kuiper, WO 91/18970 (Dec. 12, 1991), and Ignatius, U.S. 5,278,432 (Jan. 11, 1994).

2. Claims 2 and 15-18 based on Tomofuji, Kuiper, Ignatius, and Lebens, U.S. 6,305,818 B1 (Oct. 23, 2001).

3. Claim 3 based on Tomofuji, Kuiper, Ignatius, and Masuda, JP H6-319940 (Nov. 22, 1994).

4. Claim 7 based on Tomofuji ,Kuiper, Ignatius, and Janssen et al., , *Photosynthetic Efficiency of Dunaliella Tertiolecta Under Short Light/Dark Cycles,* Enzyme & Microbial Tech. 29, 298-305 (2001) [hereinafter Janssen].

5. Claims 1, 4, and 6 based on Tomofuji, Tazawa, JP 10-162609 (June 19, 1998), and Ignatius.

6. Claims 2 and 15-18 based on Tomofuji, Tazawa, Ignatius, and Lebens.

7. Claim 3 based on Tomofuji, Tazawa, Ignatius, and Masuda.

8. Claim 5 based on Tomofuji, Tazawa, Ignatius, and Kuiper.

9. Claim 7 based on Tomofuji, Tazawa, Ignatius, and Janssen.

(*See* App. Br. 12.)

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Appealed claim 1 follows:

1. (Previously Presented) A combination marine habitat and lighting system, comprising:

    a marine habitat having an open top defined by a top edge; and

    a lighting system comprising:

        a housing connectable to the top edge to substantially cover the open top, the housing including an inner side facing said open top when the housing is disposed over the top edge, and an opposite outer side;
        and

        an LED light source mounted to the inner side of said housing, the LED light source comprising at least one light engine having a plurality of individual LEDs capable of providing light at a wavelength from about 380 nm to about 690 nm; and

        cooling means for dissipating heat generated by the LED light source.

## ANALYSIS

Tomofuji, a Japanese language patent, is involved in all the rejections. Orbital asserts various procedural attacks against the SNQ and the rejections because the PTO did not provide Orbital with a translation thereof or cite a translation until after Orbital filed its Appeal Brief. Orbital never requested a translation and waited until its Appeal Brief to raise issues about a lack of a translation. The Examiner then supplied a translation in the Answer.

4
**A0021**

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Figures 1-4 of Tomofuji depict a marine habitat lighting system as shown below:



Figure 1 represents an "illuminator cover" 3 having lamps 4 therein. (*See* Tomofuji Figs. 2, 3; Abstract). The cover 3 covers the marine habitat 1 and carries a fan to cool the lamps 4. (*See* Tomofuji Figs. 1-4; Abstract).

*SNQ and Prima Facie Case - Lack of a Translation*

Orbital argues that because the PTO did not provide an English translation of Tomofuji *with* the *Order Granting Request for Ex Parte Reexamination* (Sept. 27, 2011) [hereinafter *SNQ Order*], the *SNQ Order* should be vacated. (*See* App. Br. 13.) The Examiner attached a translation to the Answer. According to Orbital, the SNQ is deficient because "no translation was provided, and the Request does not as a matter of law or fact raise any substantial new question of patentability *based on the prior art of*

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

*record.*" (App. Br. 63.) Orbital similarly argues that by relying on a
translation that was not of record at the time of the *SNQ Order*, the
Examiner did not employ "prior patent and printed publications" as required
by 35 U.S.C § 303 (a) and 37 C.F.R. § 1.510(b)(1). (*See* App. Br. 13.)
Orbital similarly attacks the Examiner's prima facie showing in the final
rejection based on a lack of a timely translation. (*See, e.g.*, App. Br. 37.)

Orbital's arguments lack merit. The *SNQ Order* cites the Tomofuji
patent and the English Abstract thereof. The applicable statute, 35 U.S.C.
§ 303 (a), does not require a translation to be cited or supplied at any
particular point during the proceeding, if at all: "[T]he Director may
determine whether a substantial new question of patentability is raised by
patents and publications . . . cited under the provisions of section 301 of
this title." The translation is merely evidence of what the patent discloses
and does not alter the citation of the patent. As the Examiner recognizes, the
"translation merely confirms the facts of the reference relied upon."
(Ans. 12.) Such evidence is proper in a reexamination proceeding to show
what the document teaches. *Cf. In re Baxter Travenol Labs*, 952 F.2d 388,
390 (1991) (extrinsic non-prior art declaration evidence can be used to show
the material impliedly disclosed in a prior art document – evidence shows
what those of skill in the art would have recognized as disclosed in the prior
art reference).

In addition, Orbital did not raise the SNQ issue or the translation issue
until the appeal and thereby waives the issue as the Examiner persuasively
finds. The Examiner relies on "*Clarification of the Procedure for Seeking
Review of a Finding of a Substantial New Question of Patentability in Ex
Parte Reexamination Proceedings,*" Fed. Reg. Vol. 75, No. 122 (June 25,

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

2010) [hereinafter *SNQ Clarification*] (*see* Ans. 43 and Appendix 2 (quoting
and attaching the *SNQ Clarification*). As the Examiner points out, the *SNQ
Clarification* requires an applicant to seek SNQ relief from an examiner in
order to preserve the issue before the Board:

> In order to preserve the right to have the BPAI review of
> [sic] the SNQ issue, a patent owner must first request
> reconsideration of the SNQ issue by the examiner.
> Accordingly, for *ex parte* reexamination proceedings ordered
> on or after June 25, 2010, the patent owner may seek a final
> agency decision from the BPAI on the SNQ issue <u>only if the
> patent owner first requests reconsideration before the examiner</u>
> (e.g., in a patent owner's statement under 37 CFR 1.530 or in a
> patent owner's response under 37 CFR 1.111) and then seeks
> review of the examiner's SNQ determination before the BPAI.
> In its appeal brief, the patent owner is encouraged to clearly
> present the issue and arguments regarding the examiner's SNQ
> determination under a separate heading and identify the
> communication in which the patent owner first requested
> reconsideration before the examiner.

(Ans. 43 (quoting the *SNQ Clarification* at 36357).)

Notwithstanding the *SNQ Clarification*, Orbital variously argues as
follows:

(A) "Patentee did not wait to point out the issue . . . . Patentee made a
good faith attempt to advance prosecution." (Reply Br. 9.)

(B) "[B]ased on the record, it is proper to raise the issue when no
translation was provided in the next office action; that is, the final rejection
dated April 20, 2012 from which the Appeal is made." (*Id.* at 10.) "Patentee
. . . *raised the issue at the first known opportunity*, following the final

rejection of April 20, 2012, from which this Appeal is made." (*Id.* at 11 (emphasis added).)

(C) The SNQ issue has been raised "by challenging any substantial new question of patentability based on improper hindsight." (App. Br. at 64.)

The record supports the timing under Orbital's argued option (B) *supra*. Orbital waited until its Appeal Brief – i.e., "at the first known opportunity" according to Orbital – to raise the issue of an improper SNQ based on a lack of a translation of Tomofuji. (*See, e.g.*, Ans. 3 (Orbital objected "for the first time" in the Appeal Brief); *accord* Reply Br. 10-11.)

Orbital also maintains that it prosecuted in good faith and did not need to request a translation earlier because "the record is in fact unclear as to whether a translation was to be provided." (Reply Br. 11.) According to Orbital, the *SNQ Order* and the Examiner's *List of References Cited by Applicant and Considered by the Examiner* (Sept. 27, 2011) indicate that only an English Abstract "was considered when determining a substantial new question of patentability under 35 U.S.C. § 303(a)." (Reply Br. 10.)

Orbital's argument essentially is that since it was unsure of whether it would be sent a translation after it received the *SNQ Order*, there was no need to require one until the appeal. However, Orbital's procedure violates the procedure required by *SNQ Clarification*. Orbital does not apprise the Board of any authority for granting relief based on a lack of diligence on its part. As soon as the Examiner became aware of Orbital's complaint – i.e., after Orbital appealed - the Examiner attached a machine translation of Tomofuji to the Answer for Orbital. (*See* Ans. 3-6; Reply Br. 11.) Orbital also could have obtained a free copy from various websites. (*See* Ans. 11,

8

**A0025**

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

n. 4.) The Examiner obtained a machine translation "on August 29, 2011
[prior to the *SNQ Order*] . . . to confirm the facts relied upon for the Order
mailed September 8, 2011, the Non-Final mailed January 24, 2011 and the
Final Office Action mailed April 20, 2012." (Ans. 3.)[2]

Perhaps recognizing that the *SNQ Clarification* shows that Orbital did
not preserve the issue, as indicated *supra*, Orbital alternatively argues that it
did preserve another SNQ issue by arguing in its earlier Amendments that
Tomofuji is cumulative to other prior art of record and the proposed
rejection was based on hindsight. (*See* Reply Br. 28, 30 (citing at
Amendments at 9 (Mar. 23, 2012).) However, these prior arguments about
"cumulative" prior art and "hindsight" do not mention the translation or the
SNQ. (*See* Ans. 5 ("Appellant . . . did not request reconsideration of the
determinations of the SNQs in the Order").) Rather Orbital "traverses the
rejections of pending claims 1-7 and 15-18" in the "Office Action dated
January 24, 2012," and does not mention the *SNQ Order*. (*See*
Amendments 5.)

While Orbital argues in the Amendments that Tomofuji is cumulative
to the art of record employed during prosecution in earlier reexamination,
the argument is in context to the rejections, not the SNQ. For example,
Orbital stresses that Tomofuji does not teach LEDs – e.g., there is "no
disclosure or teaching of using LEDs to light the aquarium."
(Amendments 9.)

Moreover, even if Tomofuji is similar to prior art cited during
prosecution (i.e., either the original patent prosecution or the prior

---

[2] The date on the bottom of the English machine translation "8/29/11"
corroborates the Examiner. (*See* Ans. Attachment 1.)

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

reexamination prosecution), that similarity, without more, does not mean an improper SNQ exits or that Orbital timely raised the SNQ issued. The SNQ in this reexamination is based on a combination of prior art, including, for example, the teachings of Tomofuji, Kuiper, and Ignatius. Ignatius specifically teaches cooling the LEDs employed for promoting plant growth as indicated further below. Orbital does not point to arguments asserting that the combination involving Ignatius is cumulative to the art cited or applied during the underlying prosecution or reexamination.

After summarizing the prosecution history including the prior reexamination history, the *SNQ Order* finds that the given reason for confirming the claims during the reexamination is that "the prior art of record failed to disclose or make obvious the cooling means" recited in the independent claims. (SNQ 5.) Based on the findings involved in the summary, Examiner defines the SNQ as follows: "Therefore, based on the summary of prosecution history, including amendments to the claims, the remarks thereto and the reasons for allowance . . . a combination of references that . . . teaches the feature of 'cooling means for dissipating heat generated by the LED light source' or a step of providing therefor as recited in claims 1-7 and 15-18 may raise a substantial new question of patentability." (SNQ Order 5.) The Examiner further finds that "a reasonable examiner would find the teachings of Tomofuji in view of Kuiper and Ignatius to be important in determining the patentability of claims 1-7 and 15-18 of the '008 Patent," and that those "teachings . . . are not cumulative to any written discussion on the record of teachings of the prior art." (SNQ Order 7.) In making the decision, the *SNQ Order* further relies on and cites the *Request for Reexamination* (SNQ Order 6 (citing Request at

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

24-26).) The Request states that "Tomofuji and Ignatius were not cited during prosecution . . . and collectively teach the 'cooling means for dissipating heat generated by the LED light source' limitation identified in the Examiner's Statement of Reasons for Patentability/Confirmation as the reason for issuance of the NIRC." (Request at 24.)

Given this prosecution history (original and during the reexamination), Orbital had to have been aware that to raise and overcome the SNQ issue, it at least would have to show that the combination of Tomofuji and Ignatius is cumulative to the prior art applied in the underlying prosecutions. By making a truncated assertion that Tomofuji alone is cumulative to prior art cited during prosecution, without mentioning the collective teachings involving Ignatius, Orbital simply fails to preserve a challenge to the clearly articulated SNQ findings – or to show that they are in error, even if the issue had been raised. As the Examiner finds, Orbital's Amendments (March 23, 2012) merely respond to the Examiner's non-final Action    (Jan. 24, 2012) "and there is no SNQ analysis by Appellant and further there is no discussion of any of the findings outlined in the [*SNQ Order*]." (Ans. 44.)

As the Examiner also recognizes, the prima facie case and SNQ are distinctly different issues. (*See* Ans. 44 (quoting MPEP § 2242 to show that SNQ is distinct from a prima facie case).) For example, as the Examiner's findings *supra* show, the SNQ issue involves whether "a reasonable examiner would consider the teaching to be <u>important</u> in deciding whether or not the claim was patentable. . . . It is not necessary that a '*prima facie*' case of unpatentability exist as to the claim in order for 'a substantial new question of patentability' to be present as to the claim." (MPEP § 2242;

11

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

*accord* Ans. 44 (quoting *inter alia* same).) In other words, Orbital's arguments to the Examiner prior to the Appeal Brief against the combination and prima facie case also do not preserve the SNQ issue.

Orbital also argues that the lack of a translation of record means "as a matter of law and fact the prior art is not read as a whole . . . and there is no substantial question of patentability based on the actual prior art of record, as required under 35 U.S.C. § 303(a) and 37 C.F.R. § 1.515." (App. Br. 62.) Again, Orbital did not preserve this SNQ argument. If Orbital's legal theory is correct, an appellant need only wait until the appeal before the Board, contrary to the clear guidance in the *SNQ Clarification, supra*, and then argue, that as a matter of law, the failure to provide a translation automatically means there is an improper SNQ.

Assuming for the sake of argument that Orbital did preserve one of the SNQ issues now presented, Orbital similarly maintains that the reference must be read "as a whole" as a matter of law which Orbital argues is impossible without a translation. (*See* App. Br. 62.) Similarly, Orbital maintains that without that translation, "there is no way for the patentee to know exactly how any substantial new question of patentability was determined, much less a basis on which to fully traverse the proposed rejections on the merits." (App. Br. 63.)

Rather than showing a reason to vacate the *SNQ Order* as Orbital urges, these arguments exemplify why Orbital should have asked the Examiner for a translation or obtained one. Moreover, the record shows, contrary to Orbital's asserted lack of knowledge about the content of Tomofuji, that Orbital understood the content in Tomofuji and used it to traverse the proposed rejections prior to the appeal.

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

For example, as the Examiner points out (*see* Ans. 13-14), prior to the appeal, Orbital discusses Tomofuji as follows:

> Applicant respectfully submits that Tomofuji (1997) is directed toward a cooling device for an illuminator for an aquarium fish basin. However, Tomofuji is cumulative to the art of record in the '008 patent (see e.g., US Patent 3,557,753; U.S. Patent 3,662,777; and U.S. Patent 3,913,526; see attached Curran Declaration, paragraphs 6 and 7). As evidenced by Figure 3, Tomofuji implements fluorescent lighting, but there is no disclosure or teaching of using LEDs to light the aquarium. In addition, without any disclosure or teaching of LEDs, there is no disclosure or teaching of a controller for such LEDs. Moreover, while Tomofuji discloses an air release portion and a fan motor (see Tomofuji, Abstract), nowhere in Tomofuji provide motivation or suggestion as to whether the same or similar device would be useful were an LED to be provided. Even as mentioned, one could cool a volume near the LED light source without cooling the LED light source and fail; this is one of the basic and fundamental gap that the subject patent addresses that was not obvious to person skilled in the art.

(Orbital's Response 9-10 (March 23, 2012).)

The Examiner also points out that Orbital's expert declarant Curran confirms a portion of Tomofuji's disclosure as reprinted below:

> JP 9308409 (herein "Tomofuji"), laid-open on December 12, 1997, and entitled "Cooling Device For Illuminator For Aquarium Fish Basin," is cited in the Office Action and is simply an extension of these well-known marine lighting systems referenced in the '008 patent, and discloses a fluorescent marine lighting system having an aquarium cover and vents for venting heated air generated by the light radiating from the fluorescent bulbs.

(Curran Decl. ¶ 7 (March 23, 2012).)

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

As seen above, Curran states that Tomofuji "discloses a fluorescent marine lighting system having an aquarium cover and vents for venting heated air generated by the light radiating from the fluorescent bulbs." In other words, Curran apparently understands what Tomofuji discloses. No material dispute exists about what Tomofuji teaches. Orbital does not allege that the Examiner incorrectly finds a claim element existing in Tomofuji. Rather, Orbital alleges a "lack of consistency" because the Examiner allegedly relied partly on the "English language abstract" and "it is not clear from the record how the machine translation was relied upon in the Order granting the reexamination." (Reply Br. 16.)

To support the latter argument, Orbital refers to the *SNQ Order* which states that the "light sources are mounted within the housing 2.'" (Reply Br. 15 (quoting *SNQ Order*).) Orbital then points out, to further show inconsistency, that according to the machine translation, the "reference 2 is a light, not a housing" and that "reference 4 refers to florescent lamps 4 arranged in covering 3, not light sources mounted within housing 2." (*See* Reply Br. 15.) Despite these assertions, no material inconsistency exists: skilled artisans would have understood that the "light" 2 simply includes the housing cover 3 and the lamps 4 therein such that the Examiner's original reference to the light 2 as a housing reasonably apprises Orbital of the basis for the claim rejections. (*See* Tomofuji Figs. 1-4; Tomofuji Translation ¶¶ 13-16.) Orbital refers to similar seeming inconsistencies related to the "cooling fan," and "fan motor 14," but Figures 1-4 clearly show a fan and motor and Orbital does not dispute that. (*See* Reply Br. 15.)

14
**A0031**

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Orbital similarly argues that the "Request . . . relies on detailed knowledge of the underlying Tomofuji text" without a translation of record including the following description: "'Air (represented by arrows in Figures 2 and 3) is drawn from the bottom of each illuminating lamp 4, through an internal cooling channel 8 of plate 7, and exhausted through top vents 12 of the cover 3.' *See* Request filed 8/17/2011, p. 31. . . ." (App. Br. 63 (quoting Request for Reexam).) Orbital complains that of these elements, "only references 3 and 12 are actually identified in the Abstract" which is "highly problematic . . . where these elements cannot be determined based on the prior art of record." (*See id.* at 63.)

In other words, according to Orbital, the Examiner and Requester relied on a translation not yet of record and identified elements that are not identified in the abstract. It is not clear why this means the *SNQ Order* should be vacated or that the prima facie case is lacking. Even if Orbital had a question about what Tomofuji teaches, it could have obtained or asked the PTO for a translation. In any event, with or without the translation or the abstract, Orbital fails to show any material discrepancy as to what Tomofuji teaches in relation to the claimed subject matter. Orbital's arguments fail to show how the translation conflicts in a material way, if any, with the English abstract or the underlying patent. The Examiner and Orbital virtually agree as to the material teachings involved in Tomofuji. Given the simple nature of Tomofuji's disclosure (*see e.g.*, figures *supra*) and the claimed invention, Orbital fails to explain persuasively why the *SNQ Order* should be vacated or that the prima facie case is deficient.

Further as to the SNQ, given the simple nature of Tomofuji's system which was well-known back to the 1960's according to Orbital and given the

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

simple nature of the claimed invention, "a reasonable examiner would consider the teaching [even without a translation] to be important in deciding whether or not the claim was patentable." (*See* MPEP § 2242.) Orbital has failed to explain substantively or procedurally how the Examiner's SNQ determination is deficient, or how the outcome would have changed had a translation been provided with the *SNQ Order*.

In a related procedural attack asserting a lack of a prima facie case based on a lack of a translation to Tomofuji, Orbital also cites to *Ex parte Jones*, 62 USPQ2d 1206 (BPAI 2001) (unpublished) and states that an Examiner cannot rely "on the English-language Abstract (only) of a foreign-language reference, where there is no translation of the underlying document." (App. Br. 31.) On the other hand, Orbital also states that "the Office explicitly relies on elements in of the Tomofuji reference that do not appear in the Abstract, and are found only in the underlying Japanese text." (*Id.*) Orbital here makes two conflicting arguments: the Examiner relied only on the Abstract, and the Examiner did not rely only on the Abstract. The record reflects that the Examiner does not only rely on the Abstract. For example, the Examiner relies on figures in Tomofuji. The Examiner also relies on the translation. (*See* Ans. 9-10; 47-65.)

*Jones* (which is not precedential) does not help Orbital. *Jones* does not address the timing procedure for providing a translation or even require the Examiner to provide a translation to an applicant unless an applicant requests one. *Jones* directs the examiner to rely on a translation if one is available and at the least, supply it on appeal so that the Board need not "expend[ ] the resources" and also because the Board is "primarily a board of review." *See Jones*, 62 USPQ2d. at 1209. *Jones* notes that reliance by

16
**A0033**

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

the Board on a translation upon which an examiner has not relied may raise new issues and warrant a new ground of rejection, *see id.*, but that situation is not in play here. Orbital does not seek reopening of prosecution and states that it would be improper to do so. (*See* App. Br. 65.) Orbital otherwise does not assert unfair surprise or allege that the Examiner's Answer relies on new material facts found only in the Tomofuji translation.

*Jones* states that an applicant should either try to obtain a translation or "request the examiner to supply a translation. If a translation is not supplied by the examiner, the applicant may wish to consider seeking supervisory relief by way of a petition (37 CFR § 1.81) to have the examiner directed to obtain and supply a translation." *Jones*, 62 USPQ2d. at 1208-1209. Orbital cites *Jones* but does not follow its outlined procedure.

As noted, the Examiner supplied the translation after Orbital raised the issue and Orbital apparently never actually asked for a translation, even on appeal. (*See* Ans. 10-11). Hence, Orbital's complaint is that it was denied something which it did not request and still does not request. The Examiner points out that "free translations are available from various websites." (Ans. 11, n. 4.) Finally, any issue premised on a lack of a translation is reviewable properly by petition to the Director. *See, e.g., Ex parte Julia Valles Camps and Xavier Miquel Gutierriez* , No. 2009-001720 (BPAI 2010)(relying on and discussing *Jones* under similar circumstances).

Orbital did not seek relief properly by way of petition to the Director or by seeking relief from the Examiner as to the translation. Orbital also did not raise any SNQ issue before the Examiner. Therefore, Orbital waives the SNQ issue. Even if Orbital did not waive the SNQ issue, Orbital does not show a substantive deficiency in the SNQ or even address the merits thereof

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

with more than truncated arguments. Orbital does not show how the
outcome would have been different had a translation been provided with an
SNQ, and even asserts that it would be improper "to reopen the
reexamination merely to place a translation of the Tomofuji reference on
record." (App. Br. 65.) Sustaining the rejections as discussed below, which
requires a higher burden than sustaining the SNQ, further shows that the
Examiner did not err finding an SNQ. Orbital also does not show a lack of a
prima facie case as set forth above and further below.

### Prior Art

Commendable illustrated summaries of the prior art of record appear
in the Request for Reexamination and the Appeal Brief. Brief discussions of
Kuiper and Ignatius immediately follow with further discussions of the prior
art of record following in the ensuing discussion.

### A. Kuiper

Kuiper teaches employing LEDs in "tubes, strips or panels that can be
placed in the aqueous environment" (Kuiper 7, ll. 17-28), including in "open
troughs or basins, or . . . closed containers or tanks." (Kuiper 7, ll. 31-32.)
Such closed containers enable aquatic organism cultivation and "more
accurate control of process conditions, such as temperature, pressure and
composition of the gas above the aqueous environment" (Kuiper 7, ll. 30-
36.) Kuiper's LEDs can be controlled to save energy "with impunity by
periodically switching the light sources on and off according to time
schedule in agreement with the time constant in question." (Kuiper 6, ll. 32-
36.) Kuiper's LEDs "save an enormous amount of energy in comparison
with normal sources of artificial light, which cover a much larger section of

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

the light spectrum and, moreover, convert a large part of the energy supplied to them into heat." (Kuiper 4, ll. 16-19.)

B. Ignatius

Ignatius discloses that LEDs or "other optoelectronic devices may be used, such as cold cathode fluorescent devices." (Ignatius, col. 3, ll. 37-38.) "The array of LEDs . . . is preferably used to enhance or test plant growth. . . . However, the LED array may have other applications, such as the irradiation of animal or human tissue. In the latter applications, the LEDs may be selected to provide different ranges of spectral emissions, as desired." (*Id.* at col. 4, ll. 48-58.) An "array 10 includes an aluminum or copper-coated substrate 12 that acts as a heat sink for heat generated by LEDs 14." (*Id.* at col. 3, ll. 38-40.) "Array 10 may consist of any number of sets of LEDS, with six sets of LEDs being preferred in a single modular housing, as depicted in FIG. 4." (*Id.* at col. 3, ll. 54-56.) "The housings in which the arrays are disposed may be used separately or as modular components of a larger system." (*Id.* at col. 3, ll. 7-8.)

"Yet another advantage is that the light intensity may be continuously varied from a zero output up to a maximum output, which may equal or exceed the equivalent of one sun output (2000 micromols per second per meter squared) from an array that is only 3 inches by 4 inches in size." (*Id.* at col. 3, ll. 1-6.)

"The housings in which the arrays are disposed may be used separately or as modular components of a larger system." (*Id.* at col. 3, ll. 7-8.) The modular housing 28 unit has air-inlets 30, a fan, and a glass plate 34 to protect the LED array 10. The array and substrate 12 can include another cooling substrate or finned heat sink 36, 38. The glass panel 34 on the

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

outside of the housing allows the LEDs to illuminate plants and other objects. (*Id.* at col. 1, ll. 34-44; col. 5, ll. 4-12; Figs. 1, 4, 5.)

*Rejections*

I. Claims 1 and 4-6 - Tomofuji, Kuiper, and Ignatius

The record supports the Examiner's findings, rationale and conclusion, which are adopted and incorporated herein by reference. (*See* Ans. 12-19; 38-41, 47-49.) Orbital's arguments primarily focus on claim 1, which is selected hereby as a representative claim except as otherwise noted. (*See* App. Br. 28-40.)

As the Examiner finds, notwithstanding Orbital's arguments, Tomofuji discloses most of the limitations of claim 1 except for the LEDs. (*See* Ans. 47-49.) Tomofuji teaches a combination marine habitat and lighting system with an open top tank 1, a housing cover 3, fan motor 14 with cooling means including cooling fans, air discharge 11, and light sources 4 mounted to an inner side of the housing over the open tank top, and a power supply. (*See* Ans. 47-49; Tomofuji translation ¶¶ 14-16; Figs. 1-4.)

The Examiner finds that Kuiper teaches LED lights in a combination marine habitat and lighting system including a controller to control the LED wavelengths. (Ans. 48.) The Examiner finds and reasons that replacing Tomofuji's fluorescent lamps with Kuiper's LEDs would have been obvious for the purpose of saving energy over fluorescent lamps and to promote aquatic growth, as Kuiper teaches. (*See* Ans. 48 (Kuiper cite omitted).) The Examiner also finds that cooling LED systems with fans was well known in the art as evidenced by Ignatius's teachings. (*See* Ans. 49.)

20
A0037

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

As discussed *supra*, Orbital asserts that "there is no actual prima face case of obviousness" (App. Br. 33) because the Examiner relies on "elements of the Tomofuji reference . . . found only in the underlying Japanese text." (App. Br. 31.) Since the elements are found in the Japanese text, no dispute exists that the claim elements are found in the reference. As such, the Examiner's prima facie case is persuasive. In addition to Orbital and Orbital's expert explaining what Tomofuji teaches as noted *supra*, Orbital's discussion of Tomofuji also appears similar to, or the same as, the Examiner's discussion. (*See* App. Br. 15-17.) Orbital does not explain persuasively how the Examiner erred in finding and determining that the combination renders obvious the claim elements.[3]

The thrust of Orbital's remaining arguments reduces to the assertion that it would not have been obvious to replace one type of light for another – Tomofuji's fluorescent light system with Kuiper's LED light system. (*See* App. Br. 34-36.) Orbital asserts that the proposed modification of Tomofuji would change its principle of operation because LED lights operate cooler than fluorescent light bulbs and LED lights would not need to be cooled with Tomofuji's system. (*See* App. Br. 37-39.) Orbital also argues that Kuiper teaches away from cooling. (App. Br. 38.) Orbital also asserts that Janssen, which is not part of this rejection, like Ignatius, teaches that "the only

---

[3] In addition to Orbital's complaint discussed *supra* about features not identified in the Abstract of Tomofuji, Orbital also complains that other features, such as features 4 and 14 are not identified in the English abstract. (*See* App. Br. 33, 36) However, Orbital and Orbital's expert Curran agree that Tomofuji discloses florescent lamps and there is no dispute that Tomofuji discloses fluorescent lamps 4, a fan motor, and related components, such as vents, as the Examiner finds. (*See* also App. Br. 15-17 (discussing Tomofuji in detail); Ans. 13, 47-48 (similar discussion).)

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

suitable location for such an [LED] array is on the outside of the aquarium."
(App. Br. 39.)

However, as the Examiner recognizes, Kuiper and Ignatius each teach, essentially, that LEDs emit less heat than other lights. Skilled artisans, given the combined teachings, would have recognized that enough LEDs at a sufficient size or power for a desired application necessarily would create heat in a tank or aquarium which would require cooling. (*See* Ans. 16-17 (citing Kuiper at 4, 10-12 and Ignatius at col. 5, ll. 4-12.).) For example, Ignatius describes an inexpensive system using a variable amount of LEDs to produce minimal heat as compared to metal halide or other prior art lamps, but the LED system preferably includes a "cooling means such as a fan or active heat sink for cooling the interior of the housing." (Ignatius, col. 2, ll. 41-44.) Orbital's expert undermines Orbital and explains that at least some known LEDs require cooling – based on "the large amount of heat generated within the high flux LEDs." (*See* Curran Decl. ¶ 25.)

In other words, the prior art of record and Orbital's expert agree, at least some LEDs do require heat extraction – apparently as either the number or size of the LEDs increases (in a given substrate area for example). Claim 1 requires "cooling means for dissipating heat generated by the LED light source." Claim 1 does not recite how many LEDs are required. Orbital does not argue that Tomofuji's cooling fan and vent structure does not satisfy the cooling means recited in the claim under the sixth paragraph of 35 U.S.C. 112 or otherwise.

The *SNQ Order* notes that, based on remarks in a prior amendment by Orbital during the prior reexamination, and the '008 patent, "the 'cooling means' appears to be a means-plus-function limitation" and describes the

22

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

corresponding structure in the '008 patent as "a fan/air cooled system that draws air from the light system and exhaust[s it] from the light housing". (*See* SNQ Order 5 (noting Orbital's citations to the '008 patent at col. 7, ll. 22-27 and 37-38).) In this proceeding, Orbital appears to attempt to broaden the corresponding structure for the cooling means to include other embodiments and describes the cooling means as follows: "Cooling means (13, 21, 35, see also Figs. 1, 3, above; Fig. 6, below) are provided for dissipating heat generated by the LED light source." (App. Br. 9.)[4] The '008 patent refers to a "fan-based cooling system 13". The system 13 includes "a fan housing with one or more fans 16 and a plurality of air inlet vents 18." ('008 patent, col. 4, ll. 26-28.) That disclosed fan based structure coalesces with the Examiner's claim interpretation in the *SNQ Order*. Orbital does not dispute this correspondence. As such, there is "no reason to depart from the position consistently taken on this issue by the parties." *Cf. Ayst Technologies Inc. v. Emap, Inc.*, 268 F.3d 1364, 1367 (Fed. Cir. 2001) (noting the parties "have not suggested that the structure recited in the limitations is sufficient to remove those limitations from the reach of section 112 paragraph 6").

In general, according to the '008 patent, a fan is not necessarily part of the cooling means: "The *cooling system uses either natural convection with the air to dissipate heat in a top-mounted lighting system*, or through water cooling via conduction, forced water cooling or an air-water loop to cool the

_____

[4] In the related appeal, PTAB 2013-004262, Orbital identifies the same structure for the broader "cooling system" recited in claim 1 at issue there.

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

submersible lighting conditions." ('008 patent, col. 3, ll. 33-39 (emphasis added).)[5]

Tomofuji's cooling system, which includes vents and fans, satisfies the recited cooling means as it corresponds to the disclosed fan and vent structure in the '008 patent, as the Examiner essentially finds. (*See* Ans. 48.) Employing Kuiper's LED panels in place of Tomofuji's florescent lights as the Examiner proposes, in combination with Tomofuji's cooling fans and vent system, satisfies the recited cooling means for cooling LEDs. (*See* Ans. 48.) Orbital does not explain why the Examiner's reading of the claim 1 cooling means onto the combination of Tomofuji's fan based structure and Kuiper's LED panel is in error. (*See* Ans. 17, 48.) (Orbital's expert does testify in his declaration, without adequate support, that Tomofuji's fan system would not cool LEDs. That testimony is discussed below.)

As discussed, Kuiper (*see supra* Prior Art A) also mentions controlling the temperature of an LED system, contrary to Orbital's arguments. (*See* Kuiper 7, ll. 35-36.) As the Examiner finds, Kuiper does not teach away from a cooling system, and "Ignatius . . . teaches a cooling system for LEDs since they do emit heat in use.") (Ans. 16-17 (citing Ignatius at col. 5, ll. 4-12).)

Orbital maintains that Ignatius does not suggest the use of cooled LED systems in an open top aquarium environment and that Ignatius's LED

---

[5] Orbital also refers in its Appeal Brief to element 21 as a type of cooling means: i.e., the "heat circulation system 21. The system 21 includes water inlet and outlet ports to dissipate the heat from the LED via the surrounding water." ('008 patent, col. 5, ll. 17-19.) In other words, this latter alternative structure does not include a fan.

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

system must be protected from the environment. (*See* App. Br. 39 (citing Ignatius at col. 2, ll. 40-49; col. 5, ll. 19-61).) Orbital further relies on Janssen, which Orbital maintains shows that Ignatius and Janssen-type LED sources "*must be protected from the environment*, and . . . *not used* in an open top marine habitat." (App. Br. 43.)

These assertions about protection and an "open top marine environment" are not persuasive because the claimed housing "substantially cover[s] the open top" – i.e., the claimed habitat is not open when the housing is attached. Also, the prior art of record does not support Orbital's arguments for various reasons. As the Examiner recognizes, Orbital's arguments improperly attack the references individually. (*See* Ans. 18, n. 6.) Contrary to Orbital's arguments, Janssen does not disparage or discuss Ignatius or *require* LEDs to be outside a housing. (*See* Ans. 18-19.) As the Examiner also recognizes, neither Janssen nor Ignatius requires that "the only place for the array is outside and not in the housing." (*See* Ans. 19.) Even if Ignatius employs a cooled LED lighting system in a housing, and Janssen employs an LED system outside of an aquarium (*see* App. Br. 23, 25 (describing Ignatius and Janssen), as the Examiner reasons: "One having ordinary skill in the art would understand this implies the lights are simply not placed in the water." (Ans. 19.)

Ignatius further supports the Examiner's rationale. Ignatius discloses modular housings with an open-vent fan based cooling system to cool a substrate or panel of LEDs. (*See supra* Prior Art B (discussing Ignatius's "array 10 [that] includes an aluminum or copper-coated substrate 12 that acts as a heat sink for heat generated by LEDs 14.") Notwithstanding that a glass panel protects the LED array from the environment, the LEDs are open to

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

moisture in the air or otherwise due to the open-vent system. (*See id.* and Ignatius Figs. 4 and 5.) Kuiper discloses similar LED strips or panels which can be employed in closed tanks. (*See supra* Prior Art B.) Accordingly, Ignatius and Kuiper both suggest that an LED strip, panel, or substrate, easily could have been employed in place the fluorescent lamps of Tomofuji.

Still further, Tomofuji's vented cover 3 and tank 1 and Ignatius's modular housings would have provided similar protection to the Kuiper or Ignatius LED substrates, strips, or panels. Based on the collective teachings, skilled artisans would have recognized how to incorporate Kuiper's LED panel array into Tomofuji's marine system as a substitute for the florescent lamps in order to save energy and protect and cool the LEDs so that they would create light for extended periods of time in order to promote marine growth.

The Examiner relies on Ignatius for its teaching for cooling an LED panel, and relies on Kuiper's LED panel for its teaching of promoting aquatic growth. (*See* Ans. 48-49.) Either LED panel satisfies the LED limitations in the claims. Ignatius's disclosure that fluorescent lights and LEDs are interchangeable further suggests the modification of using Kuiper's LED panel in place of Tomofuji's fluorescent lamps 4. As Ignatius and Kuiper also teach, varying amounts of power and different wavelengths can be used, thereby suggesting using LED panels in a variable cooling system depending on the power. Kuiper directly supports this type of control by teaching the use of LEDs in tanks to cultivate aqueous organisms while regulating the temperature thereof for optimal growth, all while saving energy. (*See* Prior Art A, B.)

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Orbital also asserts that Ignatius is not analogous art because it only applies to terrestrial applications. (App. Br. 59-60 (citing Curran Decl. ¶¶ 8, 30, 39).) The Examiner finds otherwise. (Ans. 38-39.) The Examiner's findings are more persuasive. As the Examiner reasons, Ignatius is in the analogous art of providing artificial lighting to promote organic growth of plants and animals. Ignatius also solves particular problems of regulating temperature of LED light sources to promote such growth. (*See* Ans. 39.) Nothing in Ignatius limits its organic growth to terrestrial applications, as Ignatius describes broad applications. (*See supra* Prior Art B.) As similarly noted below in the analogous art discussion of Lebens and claim 2, the preambular phrase in claim 1, "a combination marine habitat and lighting system," constitutes an intended use and does not require marine life to be in the habitat or otherwise preclude the system from growing terrestrial life.

The Curran Declaration also does not support Orbital's truncated assertion (*see* App. Br. 59-60 (citing Curran Decl. ¶ 26)) that Ignatius constitutes nonanalogous art because "retrofits" of fluorescent cooling systems to LED systems "were disfavored in general." Appellant does not explain how a general disfavor shows nonanalogous art. Curran's quotation of a second manufacturer's observation that "[g]enerally" complete new designs are "better" than "retrofit" systems only show a natural desire by a merchant to sell a new design based on the common sense notion that such a design might work better than any given retrofit. (*See* Curran Decl. ¶ 26.)

As Curran notes, terrestrial systems are discussed in the '008 patent as prior art. This discussion indicates that skilled artisans would have turned to such prior art for guidance. (*See* Curran ¶ 8.) Also, any disparagement of LEDs employed in terrestrial systems involves large tanks and low power

27

**A0044**

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

lights: according to the '008 patent, light cannot penetrate water "below a few feet without powerful lighting systems." (*Id.* (citing '008 patent, col. 1, ll. 34-42).) Claims in the '008 patent do not limit the "marine habitat" to greater than a few feet of water, even if the preambular "marine habitat" amounts to more than an intended use of the claimed system.

While Orbital also maintains that "Kuiper teaches away from any need for cooling" (App. Br. 38), Kuiper does not support Orbital for the reasons just noted. Kuiper does not disparage cooling the LEDs and discloses regulating temperature which would be required in Tomofuji's modified system having a wide range of LEDs powered to promote various forms of aquatic life. As indicated, Ignatius and Orbital's expert further show bolster the notion that some LEDs must be cooled.

Based on the foregoing discussion, Orbital has not shown error in the rejection of claims 1 and 4-6 based on Tomofuji, Kuiper, and Ignatius. Claims -6 also are discussed further below.

II. Claims 1, 4, and 6 Based on Tazawa, Tomofuji, and Ignatius

Orbital's arguments focus on claim 1 which is selected to be representative of the group. Orbital describes Tazawa in its Appeal Brief. (App. Br. 26-29.) In addition to relying on the arguments similar to those addressed *supra*, Orbital also maintains that "Tazawa teaches away from fluorescent lighting as a general principle" and teaches decorative lighting which generates little heat so that a skilled artisan would not look to Tomofuji which teaches fluorescent lights. (*See* App. Br. 41.)

Such arguments do not show unobviousness. For the reasons stated above, including the teachings of Ignatius, Orbital effectively recognizes that

28

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Tazawa suggests that LEDs on top of a water tank would have been
advantageous to promote marine growth. (*See* App. Br. 26-27.) For
example, Orbital states that in Tazawa, the "LED lamps . . . promote
*dramatic effect and growth of coral, water plants* and the like." (App.
Br. 26 (emphasis added).)

Based on the discussion above and the record, skilled artisans would
have recognized that varying types of marine life require varying amounts of
LED power which would necessitate including temperature regulation in
some systems for optimal growth. (*See* Tazawa Abstract; Ans. 21-26
(finding that skilled artisans, in light of the collective teachings, would have
known that LEDs produce some heat and would require cooling as Ignatius
evidences); *see* Ignatius discussion *supra* B).) Tazawa also teaches lighting
up LEDs selectively and that they are "high-intensity directional-light LED
lamps" which promote growth. (Tazawa, Abstract.) As also discussed
*supra*, Orbital's expert testifies that some LEDs generate heat. In other
words, the record does not evidence teaching away from cooling LEDs in a
marine housing over an aquarium.

Orbital also argues that Ignatius does not teach a cooling system
"inside the cover of an open-top [] aquarium, as taught by Tomofuji, Tazawa
and Kuiper." (App. Br. 43.) This argument is similar to that addressed
above. As indicated *supra*, Ignatius's LED substrates or Kuiper's similar
LED strips or panels are not limited to modular housings or non-marine
applications, and to the extent the LEDs and cooling system requires
protection, skilled artisans would have been able to modify the systems of
Tomofuji or Tazawa to provide the protection desired in order to maintain a
well-lit aquarium, cool the LEDs, and promote growth.

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Based on the foregoing discussion, Orbital has not shown error in the rejection of claims 1, 4, and 6. Claims 4 and 6 also are discussed further below.

III. Claims 2 and 15-18 - Based on Tomofuji, Kuiper, Ignatius, and Lebens, or, Tomofuji, Tazawa, Ignatius, and Lebens.

In addition to arguments similar to those addressed *supra*, Orbital argues that Lebens is directed to a flashlight or strobe for use in video camera applications which is non-analogous art "to the problem of marine habitat lighting." (App. Br. 45.) The Examiner responds by noting that Orbital overly restricts Lebens and points out that Lebens discloses that LED lights are useful for viewing and lighting tropical aquariums and that all the references are directed to the same field of endeavor – lighting aquariums. (Ans. 28 (citing Lebens at col. 6, ll. 31-53).) Lebens is generally directed to LED illumination and controlling an output LED spectrum. (Lebens, Abstract.)

Orbital's argument that the '008 patent is directed broadly "to the problem of marine habitat lighting" (App. Br. 45), if accepted, means that Lebens is analogous art because Lebens specifically provides marine habitat lighting. Moreover, while the '008 patent discloses promoting marine growth and controlling the spectral content of LED light (*see* col. 1, ll. 19-24), claim 2 does not require promoting marine growth and only requires marine lighting, as Orbital's argument indicates. Also, the preambular phrase, directed to marine habitat and lighting, constitutes an intended use of the product and does not preclude the claimed system from other uses.

30

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Further, the '008 patent generally discusses prior art systems that
"may or may not be portable or submersible systems that direct light at
specific marine features." (*See* '008 patent, col. 2, ll. 12-13.) In addition to
teaching such portable or submersible LED systems for viewing marine
features, Lebens also addresses another one of the '008 patent problems -
controlling the spectral output light content by controlling individual LEDs.
(*See* Lebens Abstract, col. 7, ll. 46-57; col. 6, ll. 31-39; Figs. 1-8; Ans. 50.)

As such, as with Ignatius, skilled artisans would have considered
Lebens as analogous to other marine lighting or terrestrial lighting systems
for promoting growth or viewing. *See Wyers v. Master Lock Co.*, 616 F.3d
1231 (Fed. Cir. 2010) (proposing an expansive and flexible approach to
analogous art). "'[I]t is but an evenhanded application to require that those
persons granted the benefit of a patent monopoly be charged with an
awareness' of that technology." *Dann v. Johnston*, 425 U.S. 219, 229
(1976) (quoting *Graham v. John Deere Co.* 383 U.S. 1, 19 (1966)); *In re
Kahn*, 441 F.3d 977, n.2, 987 (Fed. Cir. 2006) (discussing analogous-art test
and citing *Dann v. Johnston*).

Claim 15 is a method claim which is similar in scope to dependent
claim 2. Orbital relies on the unavailing arguments presented against the
rejection of claim 1 and the arguments about Tomofuji's Abstract not
showing sufficient evidence as to Tomofuji's cooling system and light bulbs.
(*See* App. Br. 50-51.) As indicated, no factual dispute exists about that
system. It is a simple, well-known type of fan-based marine tank cooling
system according to Orbital's expert and as Figures 1-8 in Tomofuji verify.
Orbital's remaining arguments are similar to those asserted against the

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

rejection of claim 1 and are unavailing for the reasons discussed *supra*. (*See*
App.Br. 51-56.)

Claims 16-18 depend from claim 15. Orbital relies on its unavailing
arguments against the rejection of claim 15 and also those directed against
combining Lebens discussed *supra*. (*See* App. Br. 57-58.)

Based on the foregoing discussion, Orbital has not shown error in the
rejections of claims 2 and 15-18.

IV. Claim 3 - Based on Tomofuji, Kuiper, Ignatius, and Masuda, or
Tomofuji, Kuiper, Ignatius, and Masuda.

Claim 3 requires an LED light source mounted in a water proof
housing. In addition to relying on similar arguments addressed with respect
to claim 1, Orbital also argues that Masuda "teaches to sealed-environment
space applications . . . [and] does not relate to open top marine habitats."
(App. Br. 46.) The Examiner does not employ Masuda to teach an open top
environment, but reasons that Masuda "is directed to a LED lighting system
for a fish tank wherein the LEDs are adjacent the water. Masuda further
teaches the advantages of waterproofing . . . to protect the LEDs and
circuitry from water damage." (Ans. 29.)

Orbital also maintains that Masuda generates little heat. (Reply
Br. 27.) The Examiner only employs Masuda to teach LED waterproofing.
Also, while Masuda also recognizes that the tank is "dimly lit without a
change in temperature [which] can be maintained" (Masuda ¶ 16), skilled
artisans would have recognized, on this record, a trade-off between lighting
and heat and sought to regulate temperature under high lighting conditions.

Based on the foregoing discussion, Orbital has not shown error in the
rejection of claim 3.

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

V. Claims 4-6 – Based on Tomofuji, Kuiper, and Ignatius, or Tazawa,
Tomofuji, and Ignatius

Orbital primarily relies on the unavailing arguments addressed *supra*
to allege error in the rejection of these claims. (*See* App. Br. 47-58.) While
Orbital repeats limitations of claims 4-6, Orbital does not explain how the
Examiner erred.

Claim 4 recites "wherein the LED light source, when activated, is
sufficient to support marine growth." Orbital also maintains that Kuiper and
Tazawa generate little heat. (*See* App. Br. 47.) However, the purpose of at
least Tomofuji, Kuiper, Tazawa, and Ignatius, as noted *supra*, is to promote
marine or other growth, thereby suggesting the LED intensity or power
implicitly recited in claim 4. (*See* Ans. 48-49.)

Claim 5 recites "wherein the LED light source includes at least one of
. . . discreet LEDs." Orbital relies on the unavailing argument that Kuiper
teaches away from cooling an LED light source. (App. Br. 48.) As noted
*supra*, Kuiper teaches temperature control of LEDs as does Ignatius. The
prior art of record, including an array of LEDs, necessarily discloses or
suggests "at least one of . . . discreet LEDs." (*See* Ans. 49 (citing Kuiper at
7, ll. 23-29).)

Claim 6 recites a certain spectral range for the LED light source.
Orbital relies on the unavailing arguments presented against the rejection of
claim 1 discussed *supra*. The prior art of record teaches tailoring the LED
spectrum to advance marine growth. (*See* Ans. 49.)

Based on the foregoing discussion, Orbital has not shown error in the
rejection of claims 4-6.

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

VI. Claim 7 – Based on Tomofuji ,Kuiper, Ignatius, and Janssen, or
Tomofuji, Tazawa, Ignatius, and Janssen.

Claim 7 requires the capability to adjust the light intensity from 0 to 1000 micro mols per square meter per second. Orbital relies on the unavailing argument discussed *supra* that Ignatius and Janssen each require the lights to be outside the aquarium and require protection. Such an argument ignores the combination which suggests protected lights, including LEDs, inside an aquarium to promote marine growth and visibility. Ignatius and Janssen each show that skilled artisans would have recognized varying the intensity of LEDs to suit the desired organism growth, as the Examiner finds. (*See* Ans. 18-19; 55; Janssen discussion section 2.2 and discussion *supra*; Ignatius, Abstract, col. 3, ll. 1-6 and B *supra*.)

VI. Secondary Considerations

Orbital asserts secondary and other considerations of nonobviousness, citing the Curran Declaration. (*See* App. Br. 58-61.) The Examiner persuasively finds that Orbital's showings are not sufficient to overcome the rejections. (*See* Ans. 37-42.)

As the Examiner recognizes, Curran does not produce evidence showing that allegedly infringing products satisfy the claims. As such, Curran does not show sufficient nexus to establish commercial success. (*See* Curran Decl. ¶ 32.)

Curran relies on several internet blogs or articles by "[h]obbyists as well as others in the marine lighting industry" (Curran Decl. ¶ 34) to allege long-felt need, general skepticism, lack of enablement, and other indicia of non-obviousness. (*See id.* at ¶¶ 8, 24 -40.) However, Curran does not show

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

that such aquarium hobbyists were skilled artisans who had sufficient resources and were actively seeking a solution to LED marine lighting and cooling, or that their unchallenged statements are probative.

As one example, as to skepticism, Curran testifies about an internet blogger who states that generally, LEDs did not produce "'enough energy . . . to grow anything.'" (Curran ¶ 34 (quoting Exhibit H at PFO006020.) However, the discussion is about a "night-light" (Exhibit H, PFO006020), and another attached article states that "the benefits are amazing" for marine aquaria even if there is "the high upfront cost (*see* Ex. B, PFO006006, PFO006012).

Curran also testifies that the lack of LED viability was based on "price and efficiency." (Curran ¶ 34 (citation omitted).) Curran similarly testifies about the "lack of success in finding reasonable prices for all LEDs." (Curran ¶ 18.) These uncorroborated statements at most might show a lack of funding by hobbyists, but mere cost, without more, does not show skepticism or long-felt need or any other indicia of nonobviousness.

Tazawa, Kuiper, and Janssen directly contradict any assertions about skepticism associated with employing LEDs to promote growth in aquaria. (*See* Ans. 40, 65.) In another paragraph, Curran testifies about a blogger who attended a conference by "a marine lighting expert," Dr. Joshi, who the blogger apparently refers to as "Sanjay."[6] According to the blogger, Sanjay's "measurements showed it to be on par with a PC light. *So pretty much softies and some LPs only.*" (*See* Curran ¶36 and Ex. Q attached to the declaration (emphasis added).) Curran does not explain what a PC light is,

---

[6] Though it is not clear from Curran's testimony, Sanjay's LED systems apparently came into existence after the date of invention.

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

but this reference to "softies and LPs" shows that LEDs, at some power level of course, do support the growth of softies and LPS corrals. (*See* Ex. Q at 4.) As another example, Curran cites to Exhibit R (*see* Curran Decl. ¶ 36) to allege that "Sanjay" thinks LED lighting is years away. However, Exhibit R, apparently another internet blog posting, notes that "[t]he 250W [LED] version is adequate for LPS, Softies of all kinds, clams to a depth of 24" and SPS that are elevated to within 6" of the top." (Ex. R, *see* 07-17-2007, 07:27 PM posting.) In other words, apparently softies, LPs, and clams are types of aquatic growth which can be grown with LEDs, contrary to Curran's testimony.

The blogger also discusses "SPS health/growth" and notes that "[i]t's up to us hobbyists to experiment with various corals at different depths . . . . In my experience most SPS corals do better in the top 12 to 14" range. Some like Monty caps can be deeper." (Ex. R, posting dated 07-24-02007, 09:39 A.M.) Another posting states that "no one can make anything but speculations" about Sanjay's products. (*See* Ex. R, posting dated 7-25-2007 10.01 A.M.) The posting speculates that "Sanjay is basing his theory on results he's seeing from his original PFO prototype 250W G series, a 24" model without a computer control. It's really basic." (Ex. posting dated R 07-25-2007, 10:01 AM. Posting.)

As the Examiner recognizes, the prior art of record directly contradicts the Curran Declaration and shows that LEDs were available to promote plant growth and that they require cooling. Curran explains that Ignatius teaches away from marine growth systems because such systems "provide red wavelengths of light to terrestrial plants." (Curran ¶ 37.) Despite Curran's reliance on the '008 patent for this assertion, the

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

'008 patent does not support the testimony: "The particular quantity of each type of LED in each light engine 19 depends on the marine life to be sustained," and "to sustain *certain species* of marine plant life, each light engine might include about 50% red emitting LEDs and at least about 30% blue emitting LEDs." ('008 patent, col. 5, ll. 5-9 (emphasis added).) In other words, red light is not required for all marine species.

In any event, Ignatius discloses using up to 300 or more "tightly packed" LEDs, in the 620-680 or 700-760 nanometer wavelength range, or in the 400-500nm wavelength range, with intensity in the 0 to 2000 micromols per second per meter. (Ignatius, col. 3, l. 67; col. 4, ll.11-15.) Claim 1 requires "about 380nm to about 690nm" and claim 7 recites from about 0 to 1000 micromols per second per meter. Even though the Examiner relies on Ignatius to show cooling of LEDs, Curran fails to explain why skilled artisans would have deemed Ignatius's LED system or other systems of record to be incapable of promoting marine growth and fails to show a teaching away of using LED lights to promote growth. Given the prior art of record, skilled artisans would have been able and motivated to adjust the LED wavelengths to suit the intended purpose of growing a particular plant or coral species.

Curran also testifies that skilled artisans did not know that heat generated from an "LED chip needs to be managed differently from managing heat generated by fluorescent" lights and "thus did not realize that a cooling system particularly designed for use with LEDs is required to dissipate heat." (Curran ¶ 22.) However, contrary to Curran's similar testimony (Curran ¶ 25), the '008 patent provides scant details about its fan based cooling system or the amount of heat emanating from its LEDs.

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Curran testifies that "[e]xtraction of heat improvement requires improvement in the speed of natural convention with the structure via appropriate use and placement of fans or other cooling means, unlike Tomofuji's simple air exchange." (Curran ¶ 25.) However, Curran fails to explain how the '008 patent creates better air exchange than Tomofuji's air exchange system. Curran's testimony that "[t]ypically, LED systems require cooling fins or a metal board . . . which may be used in conjunction with cooling fans" (Curran ¶ 25) merely describes the prior art cooling fin or metal board LED mounting arrangement and fan cooling thereof which Ignatius discloses and which suggests similar cooling of Kuiper's closed space temperature regulated aquatic LED strips or panels. (*See supra* A, B; Ignatius Abstract.)

Commercial success cannot be established based on what is known in the art. Orbital has not established a nexus to any commercial success. *See Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *Ormco Corp. v. Align Technology, Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

Summary

The Examiner's responses and findings with respect to the claims on appeal are adopted and incorporated herein by reference. Orbital has not shown error in the SNQ determination or the rejections of claims 1-7 and 15-18.

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

## CONCLUSION

"For over half a century, the Court has held that a 'patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men.'" *KSR Int'l. Co. v. Teleflex Inc.*, 550 U.S. 398, 415-416 (2007) (quoting *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152-153 (1950).)  Employing LEDs in place of fluorescent lights "only unites old elements" with no change in function of Tomofuji's marine tank and thereby constitutes a "principal reason" for finding the '008 patent claims 1-8 obvious.  *See KSR*, 550 U.S. at 416.

## AFFIRMED

ak

39
**A0056**

Appeal 2013-004264
Reexamination Control Nos. 90/011,865
Patent 7,473,008 B2

Patent Owner:

Dorsey & Whitney, LLP – Minneapolis
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402-1498
Attn: Patent Prosecution Docketing Dept.
Intellectual Property Practice Group – PT/23rd FL

Third Party Requester:

Maurice U. Cahn
Cahn & Samules, LLP
1100 17th Street, NW
Suite 401
Washington, DC 20036

US007473008B2

(12) **United States Patent** (10) Patent No.: **US 7,473,008 B2**

Crabb et al. (45) Date of Patent: *Jan. 6, 2009

| | | | |
|---|---|---|---|
| (54) | **MARINE LED LIGHTING SYSTEM AND METHOD** | 3,557,753 A | 1/1971 Dantoni |
| | | 3,622,777 A | 11/1971 Bovio |
| | | 3,913,526 A | 10/1975 Hall |
| (75) | Inventors: **Thomas M. Crabb**, Middleton, WI (US); **Robert C. Morrow**, Madison, WI (US); **Jeffrey C. Emmerich**, Madison, WI (US); **Marty Gustafson**, Cross Plains, WI (US) | 4,059,072 A | 11/1977 Vassallo et al. |
| | | 4,268,894 A * | 5/1981 Bartunek et al. .......... 362/158 |
| | | 4,697,374 A | 10/1987 Simms |
| | | 5,089,940 A | 2/1992 Lanzarone et al. |
| | | 5,165,778 A | 11/1992 Matthias et al. |
| (73) | Assignee: **Orbital Technologies, Inc.**, Madison, WI (US) | 5,211,469 A | 5/1993 Matthias et al. |
| | | 5,345,305 A | 9/1994 Chen |
| | | 5,394,309 A | 2/1995 Brown |
| (*) | Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days. | 5,614,378 A | 3/1997 Yang et al. |

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/689,698**

(22) Filed: **Mar. 22, 2007**

(65) **Prior Publication Data**

US 2007/0268693 A1 Nov. 22, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 11/012,702, filed on Dec. 15, 2004, now Pat. No. 7,220,018.

(60) Provisional application No. 60/529,645, filed on Dec. 15, 2003.

(51) Int. Cl.
*F21V 9/00* (2006.01)

(52) U.S. Cl. ...................... 362/231; 362/230; 362/101; 362/805

(58) Field of Classification Search ................. 362/267, 362/158, 800, 234, 231
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,066,645 A 12/1962 Mulder

(Continued)

FOREIGN PATENT DOCUMENTS

DE 42 18 880 7/1993

(Continued)

OTHER PUBLICATIONS

Dana Riddle et al., "Feature Article: Lighting the Reef Aquarium—Spectrum or Intensity?", 10 pgs., 1980.

(Continued)

*Primary Examiner*—Ali Alavi
(74) *Attorney, Agent, or Firm*—Dorsey & Whitney LLP

(57) **ABSTRACT**

A method and apparatus of lighting a marine habitat for growth utilizing an LED light system. The light system includes an LED light source, a power supply for such light source and a controller for controlling the activation status and the intensity of the LED light source.

**18 Claims, 4 Drawing Sheets**



**A1288**

## US 7,473,008 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,799,124 A | 8/1998 | Zorn et al. | |
| 6,016,038 A | 1/2000 | Mueller et al. | |
| 6,065,849 A | 5/2000 | Chen | |
| 6,074,071 A | 6/2000 | Baumberg et al. | |
| 6,340,868 B1 | 1/2002 | Lys et al. | |
| 6,523,976 B1 | 2/2003 | Turnbull et al. | |
| 6,781,329 B2 | 8/2004 | Mueller et al. | |
| 6,921,023 B1 | 7/2005 | Bright et al. | |
| 6,921,182 B2 | 7/2005 | Anderson, Jr. et al. | |
| 7,220,018 B2 * | 5/2007 | Crabb et al. | 362/234 |
| 2002/0126504 A1 | 9/2002 | Mansour | |
| 2003/0137829 A1 | 7/2003 | Ayers | |
| 2005/0052883 A1 | 3/2005 | Qi et al. | |
| 2006/0035370 A1 | 2/2006 | Lee et al. | |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 200 20 352 | 2/2001 |
| EP | 1 435 483 | 7/2004 |
| GB | 2239702 | 7/1991 |
| GB | 2416391 | 1/2006 |
| JP | 2003-61508 | 3/2003 |
| JP | 2003-169566 | 6/2003 |
| WO | WO 91/07641 | 5/1991 |
| WO | WO 99/31560 | 6/1999 |
| WO | WO 00/50809 | 8/2000 |
| WO | WO 2004/109182 | 12/2004 |
| WO | WO 2005/059087 | 6/2005 |
| WO | WO 2005/065451 | 7/2005 |

### OTHER PUBLICATIONS

Mike Kirda, "Advanced Aquarist's Online Magazine Feature Article Lighting in Reef Tanks: Some Actual Data", 19 pgs., 2003.
http://www.apogee-inst.com/quantummeter_techinfo.htm, Jun. 1, 2008, 1 pg.
http://www.apogee-inst.com/bqm_spec.htm, Jun. 1, 2008, 1 pg.
Miracle Beam Tri-Lite Aquarium Lighting System, http://www.miraclebeam.com/trilite.asp, Oct. 1, 2003.
Miracle Beam Hi-Lite Aquarium Lighting System, http://www.miraclebeam.com/hilite.asp, Oct. 1, 2003.
Pacific Coast Marine Products Reef Lamp Plus Product, http://hoppingfish.com/products/reeflamp_plus.html, Oct. 1, 2003.
CustomSeaLife, Inc. PowerCompact/Moon-Light Aquarium Lighting System, http://cgi.ebay.com/ws/eBayISAPI.dll?ViewItem&item=2350202409&category=46314, Oct. 1, 2003.
Aqualine Buschke Aquamooonlite Product, www.LEDinc.com, (2) pgs., no date.
Dana Riddle, "Effects of Narrow Bandwidth Light Sources on Coral Host and Zooxanthellae Pigments", http://advancedaquarist.com/issues/nov2003/feature.htm.
"Spectral Analysis of Recent Metal Halide Lamps: Shedding Some Light on New Reef Tank Illumination", Marine Fish USA & Reef, vol. 4, 2002, pp. 56-54.

* cited by examiner



# FIG. 1

U.S. Patent

Jan. 6, 2009

Sheet 2 of 4

US 7,473,008 B2

A1291



FIG. 2

18   13

10
Housing

19
LED
Light Engine

FIG. 3

12

11

21

22

20

Planar
Submersible
Light Engine

17

FIG. 4

11

12

17

24
Point
Submersible
Light Engine

FIG. 5

17

11

12

19

26
Corner or
Linear
Submersible
Light Engine

25

19



Lightcode Basic Structure

FIG. 6

Interface and Driver
Electronics Block Diagram

FIG. 7



Quadrant System Components and Interconnects

# FIG. 8



Light Engine Base Assembly Details

US 7,473,008 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# MARINE LED LIGHTING SYSTEM AND METHOD

## CROSS REFERENCE TO RELATED APPLICATION(S)

This application is a continuation of U.S. patent application Ser. No. 11/012,702, filed Dec. 15, 2004 now U.S. Pat. No. 7,220,018, entitled "Marine LED Lighting System and Method" which claims benefit of U.S. Provisional Application No. 60/529,645, entitled "Aquarium Lighting System for Marine Growth," filed on Dec. 15, 2003, the subject matter of which are hereby incorporated therein by reference in their entirety.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to a lighting system and method for marine growth and more specifically to a light-emitting diode-based (LED) lighting system that delivers programmable spatially and spectral controlled light with the ability to provide optimal spectral output for sustenance and growth of marine life.

### 2. Description of the Prior Art

There are many lighting systems currently available that either promote growth for land-based plants or are used for decoration or illumination of marine life. However, none of the prior art describes a system for promotion of marine life using light-emitting diode based lighting.

Plant growth lighting systems and apparatus are common in many fields that include crop production germination, tissue culture growth, horticulture, landscape architecture, and specialty growth systems. Although these systems provide for support of plant growth and development in terrestrial applications, none is suitable as a growth system for plants in aquatic settings. For productive growth, marine plants and animal life such as coral and algae require (at least in a limited manner) light of a specific intensity and within a specific range of wavelengths. Light quality and quantity are degraded as you go deeper in water which can preclude healthy sustenance at depths below a few feet without powerful lighting systems.

Marine growth apparatus are available for cultivating or permitting the growth of marine life. These systems typically consist of structures that provide a surface that permits the growth of coral, algae and other marine life, or provide a portable or permanent habitat for marine life to grow within. These include systems that are used for artificial coral reef development, coral reef regeneration, harvesting of marine life for food, and marine aquaculture for jewelry and ornamental aquariums. These inventions are typically passive apparatus that rely on natural solar light for illumination and do not use spatially or spectrally controllable artificial lighting to promote or accelerate growth.

Finally, aquarium lighting systems are also common and include light sources using fluorescent, incandescent, metal halide or light emitting diodes. These systems can be classified into two types. In type one, the primary purpose is to provide illumination to an underwater space. They contain a housing, light source within said housing, and means of power supply or connection to power supply. The light is not spatially controllable, but instead attempts to provide a consistent intensity above an area of the marine habitat. These systems use fluorescent, incandescent or metal halide light sources, which provide low intensity light with high radiant heat output and no user-defined spectral control. Maintenance is required on these systems (through light source bulb replacement) to maintain light intensity over time.

In type two, the primary purpose of the lighting system is to provide decorative lighting, including artificial moon light or colored lighting, to the marine landscape. These systems are not intended to provide sufficient quantity of light and are only supplemental to other light that supports healthy sustenance and growth. They contain a housing, a colored light source usually consisting of light-emitting diodes, lasers, color wheels or filters combined with a light source, or ultraviolet illumination, and a power supply or connection to power supply. They may or may not be portable or submersible systems that direct light at specific marine features.

Neither of these two types of marine lighting systems and apparatus is designed with an LED source offering spatial control of spectral output which can allow a user-defined or preprogrammed appropriate spectrum for growth of specific marine plant and animal life. Though the above are satisfactory for their designed applications, there is a continuing need for a marine lighting system that can be used to promote marine plant and animal life while offering the user spatial and spectral control.

## DESCRIPTION OF THE INVENTION

The present invention provides a lighting system for marine growth and more specifically to a light-emitting diode-based (LED) lighting system that delivers spatially and spectrally controlled light with optional optimal spectral output for growth of marine life. Such systems are particularly applicable to photobioreactors, fish hatcheries and aquariums, among others. Improved growth is achieved due to user programmable spectral and spatial control of light to allow for organism-specific lighting conditions with optional portability and submergibility for even greater light intensity delivery.

LED lighting technology is able to deliver high intensity light into a marine environment in a new way when compared to traditional systems. The use of LEDs enables the system to independently control the intensity of each spectral component as a function of time. This allows a user to provide the optimal wavelengths between 380 nm to 690 nm used by specific marine plant and animal life to support photosynthesis and/or optimum biological development. It provides a single controllable system which can also be used to simulate natural lighting conditions including sunrise, daylight, sunset and moonlight to provide a natural growth cycle, or to alter the lighting schedule to enhance growth during a particular phase of species development. Specific wavelengths can also be programmed to enhance the fluorescence and colors of certain species of fish and coral.

This system' LED lighting is provided with much greater intensity and lower radiant heat that traditional fluorescent-based lighting systems, changing the formerly high cooling requirements of a complete marine habitat. Another feature of this lighting technology, which is important for promoting and sustaining marine life, is that it does not experience degradation of wavelength with age as does fluorescent lighting. Fluorescent' loss of light intensity over time reduces the growth rate of certain species of marine life by minimizing the photosynthetic energy provided. These variations can also lead to the appearance of certain types of organisms such as cyanobacteria in marine habitats that occur as different light wavelengths are emitted from degraded fluorescent tubes.

In addition, LEDs are much more efficient than incandescent lamps and equal to or slightly more efficient that most fluorescent lamps. Safety of the system will also be improved due to low operating voltages and less heat dissipation. The

3

lack of glass bulbs in the system when compared to all other light sources also improves safety by eliminating the explosive failure mode of previous systems.

Specific to the design of this system, the LED light engine can be housed in a waterproof system that, unlike traditional systems, can be submersed into the marine environment. The ability to secure high intensity lighting at any point within the environment enables light to be directed at marine life features that reside at depths far from surface top-mounted lighting. Marine plants and animals require specific light intensity for optimal growth. By providing a means to deliver light of greater intensity, lower power-usage and lower thermal delivery deeper in a tank than comparable overhead lighting, better growth of plant and animal life can be achieved at depths previously unable to sustain some types of marine growth.

In general, the system of the present invention includes LED lighting, a controller, a power supply, a light housing, and a cooling system. Optional software can be included to provide users with complete programmable control of spectral, spatial, intensity or pattern of light output. The LED lighting consists of small light engines that are configured into a non-submersible top or side lighting system, or used independently to create a submersible planar, point, or line source of light. The LED light engine consists of a cluster of light-emitting diodes, including both chip, organic and discreet LEDs dependent on the preferred embodiment of the system. The control system can be configured with or without closed loop control, and is the mechanism that allows for user or manufacturer programming of lighting period and pattern, spectral content, or spatial content of the light delivered. The cooling system uses either natural convection with the air to dissipate heat in a top-mounted lighting system, or through water cooling via conduction, forced water cooling or an air-water loop to cool the submersible lighting configurations.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is an isometric view of the marine lighting system in accordance with the present invention embodied in a top or side-mount configuration.

FIG. 2 is an isometric view of the light engine and configurable housing configuration of FIG. 1.

FIG. 3 is an isometric view of the marine lighting system embodied in a submersible planar light source configuration.

FIG. 4 is an isometric view of the marine lighting system embodied in a submersible point source configuration.

FIG. 5 is an isometric view of the marine lighting system embodied in a submersible linear or corner light source configuration.

FIG. 6 is an elevational front view of a lighting system in accordance with the present invention with a plurality of vertically spaced light engines.

FIG. 7 is a block diagram for the controller interface and driver electronics.

FIG. 8 is a view showing a lighting system in accordance with the present invention with a plurality of vertically oriented series of light engines.

FIG. 9 is a top fragmentary view of a portion of a light engine base, with the cover removed.

4

FIG. 10 is an elevational end view of the light engine base shown in FIG. 9, with the cover in place.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

All of the preferred embodiments of the invention include a light source, a light source housing, a power supply, a controller, connection cables, mounting hardware and (when necessary) cooling system.

In the first embodiment, the lighting system is configured into a nonsubmersible light source as shown in FIG. 1. The use of LEDs for top-mounted lighting configurations produces a low profile size system when compared with current incandescent, fluorescent or metal halide lighting systems. In addition to its lower profile size, this configuration will operate with considerably less noise and radiant heat output than comparable fluorescent or metal halide systems.

In FIG. 1, the housing 10 is mounted to the top of a marine habitat and is connected to the controller 11 through a connection cable 14. The controller 11 can include an optional port for a user connection to a computer that will enable users, through software, to program spatial, spectral and intensity controls. The controller is then connected through a power cable 15 to either a low or high efficiency power supply 12 dependent on user options. Attached to the housing is a fan-based cooling system 13. The system 13 includes a fan housing with one or more fans 16 and a plurality of air inlet vents 18. During operation, the fans 16 draw ambient air through the vents 18 to cool the LED light sources within the housing 10. The housing 10 also includes mounting hardware for attachment of the housing 10 to the top or side of the marine habitat 17.

The controller 11, which will be described in greater detail below, can come preprogrammed into a spectral and spatial configuration to sustain and enhance marine plant and animal life, or the settings can be accessible by the user. The controller can be programmed into a closed loop system to react to local lighting, temperature, or other environmental factors. It can also provide one-way user-programmable control of the lighting period, the spectral content, the spatial control, or the intensity control.

FIG. 2 shows a detail of the LED light engines 19 and housing 10. The light engines 19 are constructed on moveable components that allow a user to control their placement on the mounting bars of the light housing 10. A user can configure their overhead or side lighting to provide equal illumination and intensity across the entire top portion of the enclosure, or alternatively, to configure patterns or areas of greater light intensity.

Each of the light engines 19 is made up of a plurality or an array or cluster of individual LEDs. Each of the individual LEDs is capable of providing a predetermined variable intensity of light (depending on the applied power) at a predetermined wavelength when provided with a power source. In accordance with the present invention, the individual LEDs have intensity levels which, when combined in a light engine, provide a light engine 19 which is capable of producing light intensity of between 0 and about 1000 or more micromols per square meter per second, and more preferably between 0 and about 300 micromols per square meter per second. Each individual LED also preferably emits colors of light at a wavelength within the spectral range of 380 nm to 690 nm. In other words, each of the individual LEDs emits light of a wavelength in the red through the blue region of the spectrum. Although the preferred embodiment utilizes LEDs which emit light in the 380 nm to 690 nm region of the spectrum in

US 7,473,008 B2

5

the form of red, blue and/or green light emitting LEDs, LEDs emitting other colors could be utilized as well. The light engines, and in particular each of the individual LEDs, is driven by a power source which, in the preferred embodiment is 24 volts of direct current. The particular quantity of each type of LED in each light engine 19 depends on the marine life to be sustained. To sustain certain species of marine plant life, each engine might include at least about 50% red emitting LEDs and at least about 30% blue emitting LEDs.

In the embodiment shown in FIG. 3, an LED light system comprised of one or more light engines has been mounted in a planar configuration, equivalent to those components used in the top and/or side mount configurations of FIGS. 1 and 2 to comprise a large overhead lighting system. In this case, a series of light engines is contained in a submersible, transparent watertight housing 20. The housing 20 is preferably combined with a heat circulation system 21. The system 21 includes water inlet and outlet ports to dissipate the heat from the LED via the surrounding water. Mounting hardware 22 is included to attach the housing 20 to the sides of the marine habitat 17. Attachment means may also be provided to attach to the housing 20 from the bottom of the habitat 17, or to suspend the housing 20 from the top of the habitat 17. This embodiment will allow for planar light distribution from any angle or depth into the marine environment. The intensity and spectral content of the light from the light engines can be controlled, via control of the individual LEDs within that light engine, to either specific requirements for a particular marine life or to simulate surface lighting at a lower depth.

In the embodiment shown in FIG. 4, an LED light cluster 24 has been mounted into a point configuration. It is contained in a submersible, transparent watertight housing. This light cluster 24 or light engine comprises a plurality or array of individual LEDs which are controlled or described. The housing may be combined with a heat circulation system to dissipate the heat from the light cluster 24 or engine out of the surrounding water. Mounting hardware is provided to attach the light to the sides of the habitat 17. Means may also be provided to attach the housing to the bottom or suspend it from the top of the habitat 17. This embodiment will allow for directed, controllable light to be isolated on a particular feature in the marine landscape that requires light of a specific intensity or wavelength to sustain or support its growth.

In the embodiment shown in FIG. 5, a number of LED engines 19 have been mounted into a linear configuration on a mounting rail 25. The rail 25 is contained within a submersible, transparent watertight housing 26. The housing 26 is preferably combined with a heat circulation system to dissipate the heat from the LED out of the surrounding water. Mounting hardware is included and intended to provide attachment of the light along the sides of the marine habitat 17. This mounting system offers users the ability to light a section of the habitat along a depth or length and provide spatially or spectrally controlled lighting unobtrusively within the marine landscape.

The control for the light system of the present invention is designed to control the activation (on/off) status of each type of individual LEDs within each light engine and when activated (on), to control the intensity of each type of the individual LEDs within each light engine. Further, because each type of the individual LEDs emits its own particular wavelength of light, the spectral content or quality of each light engine is also controlled. In this way, both the intensity and the spectral content or quality of each light engine is controlled. More specifically, the control system is designed to provide independent control of the intensity of each spectral component as a function of time for selection of optimal

6

wavelengths between about 380 nm to about 690 nm used by specific marine plant and animal life to support photosynthesis and optimal biological development.

The planar mounted design of FIGS. 1 and 2 is designed to provide a single controllable system to best simulate natural lighting conditions including such things as sunrise, daylight, sunset and moon light to provide a natural growth cycle for any marine life. Such a system may also be used to alter the lighting schedule to enhance growth during a particular phase of species development.

The submersible embodiments of FIGS. 3, 4 and 5 provide the ability to provide high intensity lighting at any point within the habitat environment. This enables light to be directed at marine life that resides at depths far below the natural surface lighting or the top mounted lighting of FIG. 1. By providing submersible light sources such as shown in FIGS. 3, 4 and 5, better growth of plant and animal life can be achieved at depths previously unable to sustain some types of marine growth. With the submersible embodiments of FIGS. 3, 4 and 5, the lighting system can be integrated into a photobioreactor to create layers of light throughout a growing environment, effectively doubling or tripling the surface area for growth of organisms such as algae.

The basic system of construction is for a series of LED light engines to be spaced along each required one foot length. Preferably, each light engine contains a combination of individual LEDs, with each type of LED emitting its own particular wavelength, preferably between 380 nm and 690 nm. Each light engine preferably includes in excess of 100 total LEDs per square inch of light engine surface. The particular percentage of each type (i.e., wavelength type) of LEDs will depend on the specific marine life to be sustained and promoted. It is also contemplated that each light engine would also carry two photodiodes which may be used for closed loop light output control or as part of a plant growth detection/light engine engagement system.

Underwater lighting systems used for microalgae growth are also inherently subject to algae bloom or photosynthetic bacteria on the lighting surface. Therefore, a level of opaqueness may be experienced at different underwater light levels. This will dictate if the addition of a cleaning system is required by the user. If it is, the design can include the addition of low level ultra-violet LEDs to inhibit growth at the lighting surface without interfering with marine animal. Further, the housing used in the embodiments described above is produced with a non-leaching antibacterial plastic coating to inhibit growth at the lighting surface. As an alternative, the housing can be provided with a mechanical cleaning mechanism to periodically "wipe off" organisms from either an enclosed or non-enclosed lighting surface.

The control system preferably contains output controls and a main DC power supply to support a single light engine or a series of light engines. A microcontroller within the control assembly will read the control settings and the timer output and send appropriate signals to all light engines over the controller area network (CAN) bus.

On the outside of the control system, individual slider controls are provided to adjust the output irradiance of each spectral element independently. It will also include an illumination level control switch that will allow the user to manually select the number of light engines which are illuminated. A simple programmable digital timer may be provided to control day/night illumination cycles.

The power supply is a 1500 W, +24 Vdc power supply. The AC input for the power supply may be standard 120 Vac wall outlet power or 220 Vac at the users requirement. Twenty-four volt output power from the power supply will be routed to the

US 7,473,008 B2

7

power and signal distribution assembly. This assembly will provide the connection points to distribute power to each of the light engines as well as the required fusing. One low current fuse will be provided for each group of two light engines. In addition to power distribution the assembly will facilitate routing of the CAN bus signals to each of the light engines.

The interface electronics of the control system include control signals delivered over a two wire (CAN) bus from the main system controller to the light engine interface micro-controller. Command messages will control the number of light engines to be energized as well as the individual wavelength output intensities. Since each light engine can be individually controlled via control of its individual LEDs, the user is able to create lighting effects that mimic additional colors of light, including white, purple, etc. The driver electronics that control these individual selections consist of individual light engine selection switches and independent wavelength linear current drivers. Power to the driver electronics is provided by a two wire pair (+24 volt and ground) from the power and signal distribution assembly in the controller.

For those embodiments that have a fan/air cooled system, a small cooling fan will be mounted to the top of each light engine system. Air will be drawn from the bottom of each light engine system, through the internal cooling channel, over the driver electronics and exhausted through the top of the unit.

FIG. 6 shows the basic structure of a lighting system in accordance with the present invention with a series of vertically spaced light engines. Specifically, the structure of FIG. 6 includes a light engine base assembly 30 and a plurality of vertically spaced LED light engines 31. When used, the entire base 30 and the light engines 31 would be mounted within a housing having a substantially transparent surface. Because this is primarily an underwater or submersible structure, the housing would be watertight. The interface electronics 32, the driver electronics 34 and the cooling mechanism are provided at the top of the light engine base 30 as shown.

FIG. 7 shows a block diagram for the control interface and driver electronics.

FIG. 8 is a schematic diagram showing a control assembly and a powered signal distribution assembly for controlling a series of vertical LED light strips of the type shown in FIG. 6.

FIG. 9 is a detailed view of a portion of the light engine base and connected light engine. Specifically, the base 30 is comprised of an aluminum U channel and includes a cooling fin, an interconnect for a printed circuit board and the interconnections with the light engine.

FIG. 10 is an end view of the light edge and base of FIG. 9 and shows similar elements.

Accordingly, the present invention is directed to an LED light system and method for controlling light to promote and/or sustain marine life (either plant or animal) in a marine habitat. The system includes one or more light engines mounted to a housing. If the system is designed to be submersible, the housing must be watertight. Each light engine is made up of a plurality or an array of individual LEDs (preferably at least 50 and more preferably at least 100). Each of these individual LEDs emits light at a particular wavelength, with all LEDs emitting a similar wavelength comprising a "type" of LED. In the preferred embodiment, these wavelengths are in the 380 nm to 690 nm range and comprise one of red, blue or green, although other colors could be used as well. Each type of LED within a light engine is capable of being activated (on) or deactivated (off) and, when activated, each type of LED is capable of having its intensity varied as a result of providing variable power.

8

Each light engine, and in particular each type of LED within a light engine, is operatively connected to a power source through a control system. The control system is designed to control each type of LED within a light engine, and thus control the light output of each light engine. Specifically, the control is designed to control the activation status (on/off) of each type of LED and, when activated, the intensity of each type of LED. In this way, the intensity and the spectral quality or content of each light engine can be controlled.

The method aspect of the present invention includes providing a housing with an LED light source mounted thereto. Such LED light source would preferably include one or more light engines made up of a plurality or array of individual LEDs as described above. The method would also include providing a power source and controlling the illumination of the light engines via controlling the activation status and intensity of each type of LED therein.

The invention claimed is:

1. A combination marine habitat and lighting system, comprising:

   a marine habitat having an open top defined by a top edge; and

   a lighting system comprising:

      a housing connectable to the top edge to substantially cover the open top, the housing including an inner side facing the open top when the housing is disposed over the open top, and an opposite outer side; and

      an LED light source mounted to the inner side of the housing, the LED light source comprising at least one light engine having a plurality of individual LEDs capable of providing light at a wavelength from about 380 nm to about 690 nm.

2. The combination marine habitat and lighting system of claim 1, further comprising:

   a power supply sufficient to drive the LEDs; and

   a controller connected with the power supply for controlling activation status and intensity of one or more of the individual LEDs.

3. The combination marine habitat and lighting system of claim 1, wherein the housing is waterproof and the LED light source is mounted within the housing.

4. The combination marine habitat and lighting system of claim 1, wherein the LED light source, when activated, is sufficient to support marine growth.

5. The combination marine habitat and lighting system of claim 1, wherein the LED light source includes at least one of chip-based, organic or discreet LEDs.

6. The combination marine habitat and lighting system of claim 1, wherein LED light source, when activated, provides light with a spectral range of about 380 nm to about 690 nm.

7. The combination marine habitat and lighting system of claim 1, wherein each of the light engines is capable of providing light intensity of from 0 to 1000 micro mols per square meter per second.

8. A lighting system for marine growth in a marine habitat having an open top, comprising:

   a housing disposed over the open top of the marine habitat; and

   an LED light source disposed on an inner side of the housing facing the open top of the marine habitat, the LED light source comprising at least one light engine having a plurality of individual LEDs capable of providing light at a wavelength from about 380 nm to about 690 nm.

9. The lighting system of claim 8, further comprising:

   a power supply sufficient to drive the LEDs; and

US 7,473,008 B2

9

10

a controller connected with the power supply for controlling activation status and intensity of one or more of the individual LEDs.

**10.** The lighting system of claim **8**, wherein the housing is waterproof and the LED light source is mounted within the housing.

**11.** The lighting system of claim **8**, wherein the LED light source, when activated, is sufficient to support the marine growth.

**12.** The lighting system of claim **8**, wherein the LED light source includes at least one of chip-based, organic or discreet LEDs.

**13.** The lighting system of claim **8**, wherein the LED light source, when activated, provides light with a spectral range of about 380 nm to about 690 nm. ,

**14.** The lighting system of claim **8**, wherein each of the light engines is capable of providing light intensity of from 0 to 1000 micro mols per square meter per second.

**15.** A method of lighting a marine habitat for marine growth, comprising:

provided an LED light source disposed on an inner side of a housing;

positioning the housing over an open top of the marine habitat;

providing a power supply for driving the LED light source;

controlling illumination of the LED light source at a level sufficient to support the marine growth.

**16.** The method of claim **15**, wherein controlling illumination of the LED light source includes controlling at least one of (a) lighting period, (b) light spectral content, (c) light spatial content, (d) light intensity, and (e) decorative patterns of the LED light source.

**17.** The method of claim **15**, further comprising controlling activation status of the LED light source.

**18.** The method of claim **15**, further comprising controlling intensity of the LED light source.

* * * * *

A1298

US007473008C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8516th)

# United States Patent
Crabb et al.

(10) **Number:** US 7,473,008 C1
(45) **Certificate Issued:** Sep. 6, 2011

(54) **MARINE LED LIGHTING SYSTEM AND METHOD**

(75) Inventors: **Thomas M. Crabb**, Middleton, WI (US); **Robert C. Morrow**, Madison, WI (US); **Jeffrey C. Emmerich**, Madison, WI (US); **Marty Gustafson**, Cross Plains, WI (US)

(73) Assignee: **Orbital Technologies Corporation**, Madison, WI (US)

**Reexamination Request:**
No. 90/009,662, Mar. 29, 2010

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | 7,473,008 |
| Issued: | Jan. 6, 2009 |
| Appl. No.: | 11/689,698 |
| Filed: | Mar. 22, 2007 |

**Related U.S. Application Data**

(63) Continuation of application No. 11/012,702, filed on Dec. 15, 2004, now Pat. No. 7,220,018.

(60) Provisional application No. 60/529,645, filed on Dec. 15, 2003.

(51) **Int. Cl.**
*F21V 9/00* (2006.01)

(52) **U.S. Cl.** ........................ 362/231; 362/101; 362/230; 362/805

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,729,076 A | 3/1988 | Masami et al. | |
| 6,305,818 B1 | 10/2001 | Lebens et al. | |
| 6,501,103 B1 | 12/2002 | Jory et al. | |
| 6,554,450 B2 | 4/2003 | Fang et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 06-319410 | 5/1993 |
| JP | 10-162609 | 11/1996 |
| WO | WO/91/18970 | 6/1991 |

OTHER PUBLICATIONS

Kroger, Ronald, Campbell, Melanie, and Fernald , R., "The development of the crystalline lens is sensitive to visual input in the African cichlid fish, *Haplochromis burtoni*." Vision Research, vol. 41, 2001, pp. 549–559.

Janssen, Marcel, Slenders, Peter, Tramper, Johannes, Mur, Luuc, and Wijffels, Rene. "Photosynthetic efficiency of *Dunaliella tertiolecta* under short light/dark cycles." Enzyme and Microbial Technology, vol. 29, 2001, pp. 298–305.

*Primary Examiner*—Minh T Nguyen

(57) **ABSTRACT**

A method and apparatus of lighting a marine habitat for growth utilizing an LED light system. The light system includes an LED light source, a power supply for such light source and a controller for controlling the activation status and the intensity of the LED light source.



**A1299**

US 7,473,008 C1

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **8-14** are cancelled.

Claims **1-2** and **15** are determined to be patentable as
amended.

Claims **3-7** and **16-18**, dependent on an amended claim,
are determined to be patentable.

1. A combination marine habitat and lighting system,
comprising:
  a marine habitat having an open top defined by a top edge;
    and
  a lighting system comprising:
    a housing connectable to the top edge to substantially
      cover the open top, the housing including an inner
      side facing the open top when the housing is dis-
      posed over the top edge, and an opposite outer side;
      and

2

    an LED light source mounted to the inner side of the
      housing, the LED light source comprising at least
      one light engine having a plurality of individual
      LEDs capable of providing light at a wavelength
      from about 380 nm to about 690 nm*; and*
  *cooling means for dissipating heat generated by the LED*
    *light source.*

2. The combination marine habitat and lighting system of
claim **1**, further comprising:
  a power supply sufficient to drive the LEDs; and
  a controller connected with the power supply for control-
    ling activation status and intensity of one or more of the
    individual LEDs*, wherein a spectral content of the at*
    *least one light engine is controlled by independent con-*
    *trol of the individual LEDs within the light engine, each*
    *of the individual LEDs being of a type emitting its own*
    *particular wavelength which is being independently*
    *controlled by the controller.*

15. A method of lighting a marine habitat for marine
growth, comprising:
  providing an LED light source disposed on an inner side
    of a housing;
  positioning the housing over an open top of the marine
    habitat;
  providing a power supply for driving the LED light
    source;
  controlling illumination of the LED light source at a level
    sufficient to support the marine growth*; and*
  *providing cooling means for dissipating heat generated by*
    *the LED light source.*

\* \* \* \* \*

Re-Examination of U.S. Patent 7,473,008
Reply to O.A. of January 24, 2012

Dkt. No.: P033837.US.10

## LISTING OF THE CLAIMS

The listing of claims will replace all prior versions, and listings, of claims in the application.

### Listing of Claims:

1.    (Previously Presented) A combination marine habitat and lighting system, comprising:

   a marine habitat having an open top defined by a top edge; and

   a lighting system comprising:

   a housing connectable to the top edge to substantially cover the open top, the housing including an inner side facing the open top when the housing is disposed over the top edge, and an opposite outer side; and

   an LED light source mounted to the inner side of the housing, the LED light source comprising at least one light engine having a plurality of individual LEDs capable of providing light at a wavelength from about 380 nm to about 690 nm; and

   cooling means for dissipating heat generated by the LED light source.

2.    (Previously Presented) The combination marine habitat and lighting system of claim 1, further comprising:

   a power supply sufficient to drive the LEDs; and

   a controller connected with the power supply for controlling activation status and intensity of one or more of the individual LEDs, wherein a spectral content of the at least one light engine is controlled by independent control of the individual LEDs within the light engine, each of the individual LEDs being of a type emitting its own particular wavelength which is being independently controlled by the controller.

3.    (Previously Presented) The combination marine habitat and lighting system of claim 1, wherein the housing is waterproof and the LED light source is mounted within the housing.

4.    (Previously Presented) The combination marine habitat and lighting system of claim 1, wherein the LED light source, when activated, is sufficient to support marine growth.

Re-Examination of U.S. Patent 7,473,008
Reply to O.A. of January 24, 2012

Dkt. No.: P033837.US.10

5.      (Previously Presented) The combination marine habitat and lighting system of claim 1, wherein the LED light source includes at least one of chip-based, organic or discreet LEDs.

6.      (Previously Presented) The combination marine habitat and lighting system of claim 1, wherein the LED light source, when activated, provides light with a spectral range of about 380 nm to about 690 nm.

7.      (Previously Presented) The combination marine habitat and lighting system of claim 1, wherein each of the light engines is capable of providing light intensity of from 0 to 1000 micro mols per square meter per second.

8. (Cancelled)

9. (Cancelled)

10. (Cancelled)

11. (Cancelled)

12. (Cancelled)

13. (Cancelled)

14. (Cancelled)

15.      (Previously Presented) A method of lighting a marine habitat for marine growth, comprising:

    providing an LED light source disposed on an inner side of a housing;

    positioning the housing over an open top of the marine habitat;

    providing a power supply for driving the LED light source;

    controlling illumination of the LED light source at a level sufficient to support the marine growth; and

    providing cooling means for dissipating heat generated by the LED light source.

A1302

Re-Examination of U.S. Patent 7,473,008                                    Dkt. No.: P033837.US.10
Reply to O.A. of January 24, 2012

16.     (Previously Presented) The method of claim 15, wherein controlling illumination of the LED light source includes controlling at least one of (a) lighting period, (b) light spectral content, (c) light spatial content, (d) light intensity, and (e) decorative patterns of the LED light source.

17.     (Previously Presented) The method of claim 15, further comprising controlling activation status of the LED light source.

18.     (Previously Presented) The method of claim 15, further comprising controlling intensity of the LED light source.

A1303